DISTRICT OF COLUMBIA,
et al., Petitioners,

v.

KORA & WILLIAMS CORPORATION
and Insurance Company of North
America, Respondents.

No. 97–AA–98.

District of Columbia Court of Appeals.

Argued Oct. 28, 1999.
Decided Dec. 30, 1999.

Edward E. Schwab, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for petitioners.

David C. Romm, McLean, VA, with whom Richard G. Mann, Washington, DC, was on the brief, for respondents.

Before FARRELL and GLICKMAN, Associate Judges, and NEWMAN, Senior Judge.

FARRELL, Associate Judge:

In this dispute over the performance of a major government contract, the District of Columbia challenges the decision of the District of Columbia Contract Appeals Board ("the Board") converting the default termination of Kora & Williams Corporation to a termination for the convenience of the District of Columbia and awarding Kora & Williams and its surety (hereafter collectively "K & W") total costs of $12,410,991 plus interest at four percent per annum. The District primarily attacks two procedural rulings of the Board by which, at the entitlement hearing,[1] it restricted the testimony that two expert witnesses retained by the District would be allowed to give, and declined to impose sanctions on K & W for what the District argues was K & W's expert's failure to make discovery of the main exhibits he employed at the hearing. The District also challenges the Board's allocation of the burden of proof at the entitlement hearing, mounts an array of attacks on the manifold basis for the Board's decision on entitlement, and contends that the Board erroneously failed to require exhaustion of administrative remedies before deciding the issue of quantum. After considering all of the District's arguments, we affirm the Board's decision in its entirety.

## I. Background

This litigation had its origin in Congress' passage of the Union Station Redevelopment Act of 1981 intended to complete the

---

1. K & W's appeal to the CAB was bifurcated with the consent of the parties into an entitlement hearing dealing with the lawfulness of termination for default, and a quantum hearing (in the event that proved necessary) to establish costs or damages.

restoration and expansion of Union Station. As part of the Act, Congress gave the District of Columbia responsibility for completing the parking structure and developing railroad access facilities at Union Station. The project required completion of the bus and parking garage and construction of: a Main Level Extension between the garage and H Street; a Lower Track Access Facility; a Southeast Garage Ramp; and a Link Structure connecting the historic Union Station with the garage and the Lower Track Access Facility. Restoration of the Union Station historic structure was not the District's responsibility, but was to be performed contemporaneously by the Union Station Redevelopment Corporation, a public body. The District engaged Sverdrup & Parcel, Consulting Engineers ("Sverdrup") to do the structural and engineering design of the parking facility, and eventually contracted with K & W to perform the construction work. The contract with K & W established November 11, 1985 (550 calendar days) as the completion date for the Link Structure and October 27, 1986 (900 calendar days) as the completion date for all remaining contract work.

From the beginning, as the Board found, the construction work was beset with problems stemming from design. Specifically, Sverdrup had designed the Main Line Extension to require four or more train tracks to be out of service during construction, but AMTRAK (which, through a subsidiary, conducts the railroad operations at Union Station) insisted that no more than two tracks be out of service at any one time. Also, a "sequencing paradox" resulted from the fact that the contract specified completion of the Inbound Passageway (the majority of the Lower Track Access Facility) before construction of the adjoining lower level Link Structure, even though equipment systems on which the former depended were to be installed in the lower level Link. Additional problems developed during construction with the installation of the skylights and supporting structures, pile driving operations, AM-

TRAK's refusal to vacate certain offices, and denial of access to an active track spur that serviced the nearby United States Government Printing office, all problems which affected the planned overall construction sequence known as the "critical path."

These and similar problems made completion of the project by the contract dates impractical, although responsibility for the resulting delays was strongly disputed at the entitlement hearing. In January of 1987, the District purported to establish a new overall completion date of November 1987, later informing K & W that it would be held to a promised July 1987 finish date for the Link Structure. In April of 1987, the District warned K & W that it was considering action to terminate the contract for fault, and on June 19, 1987, it terminated the contract in a letter that gave as reasons K & W's:

> current failure and refusal to make sufficient progress toward the timely completion of the link structure and garage; the lack of diligence to prosecute work toward timely completion; and failure and refusal to complete work on time throughout this contract . . . .

K & W appealed the termination to the Board, which eventually conducted an evidentiary hearing on entitlement at which over 6000 exhibits were introduced and testimony spanned more than 5800 transcript pages. Following post-hearing briefing, the Board issued a 170–page opinion and order in which it concluded that the default termination was unlawful and should be converted to one for the convenience of the District. The Board found, as independent grounds for its decision, that:

> (1) K & W was excusably delayed in its "failure to make progress" toward the new completion dates; (2) in fact the District had waived and never reestablished contract completion dates; (3) the District's decision to terminate without analyzing and allocating responsibil-

ity for the delays was an abuse of discretion; (4) the District materially breached the contract by (a) refusing to grant equitable adjustments, (b) wrongfully withholding payments, and (c) failing to resolve major design defects; (5) the contracting officer abdicated his personal responsibility for the default decision; (6) the District failed to submit the proposed default termination to the Director of Administrative Services as required; (7) the default decision was arbitrary and capricious; and (8) the decision to terminate was made in bad faith.

Following unsuccessful negotiations and then a hearing on quantum, the Board awarded K & W costs for unpaid performance, subcontractor settlements, and claim preparation.

## II. *Discussion*

### A. *Evidentiary Rulings*

The District's primary argument in this court relates to two evidentiary rulings by the Board which the District contends undermined the fairness of the entitlement hearing. First, as a discovery sanction, the Board limited the testimony of the two principal experts the District intended to offer regarding cause for the construction delays to the testimony they had given at their depositions; and second, the Board refused to exclude exhibits prepared by K & W's main expert that had not been turned over to the District until a month before trial and after the witness had been deposed. We treat these rulings in succession. Ultimately, the District has not convinced us that it was prejudiced by either ruling to the extent necessary to permit reversal.

### 1. *The Testimony of Myers and Fiander*

#### a. *Background*

Following a premature appeal of the default termination to the Board (later vol-

untarily dismissed), K & W filed a claim with the Director of the Department of Administrative Services in January 1988, asserting that the default termination was improper because the District had not granted necessary time extensions or otherwise followed proper procedures in terminating. In November of 1989 K & W was permitted to appeal to the Board,[2] which it did in January of 1990 filing its formal complaint in March of that year. K & W served interrogatories on the District asking it, among other things, to identify its expert witness on the delay issues. In October of 1990, the District substituted new counsel, who moved for a 120–stay of the proceedings and an enlargement of time to respond to the interrogatories. The Board stayed further proceedings until January of 1991. Meanwhile the District had again assigned new counsel to the case, and he moved for an additional stay which the Board granted until the end of February. Over the next six months the District failed to meet an agreed deadline for response to interrogatories and document requests. At a status conference in June of 1991, the Board ordered the District to meet specific deadlines for discovery and, in particular, to identify its experts and their opinions by November 29, 1991.

In July of 1991, now four years after the termination, the District's counsel in the case for the first time advised the District of Columbia Department of Public Works of the need to retain expert witnesses. At the same time, the District responded "N/A" (non-applicable) to interrogatories asking it to identify its experts. In November 1991 the District's counsel suffered a heart attack and soon thereafter retired. New counsel—the District's fourth—moved for an extension of time until early February 1992 in which to name the District's experts and file supporting witness statements required by Super. Ct. Civ. R.

---

**2.** This resulted from a "deemed denial" of the claim pursuant to D.C.Code § 1–1188.5(d) (1999) when the Director failed to decide the claim within the time specified by statute.

26(b)(4).[3] Thereafter, as the Board later recounted:

> With discovery continuing, and despite two Board orders granting the District enlargements of time in which to identify expert witnesses, the District moved again on January 13, 1992, for an enlargement of time in which to identify its proposed experts. When appellants opposed the motion four days later, they also moved for sanctions. On January 29, 1992, the Board ordered the District to provide, within seven days, an explanation as to why it had continually failed to identify its experts. Between that time and February 4, the parties entered into a stipulation regarding discovery: essentially, the District was given until February 28, 1992, in which to identify its trial experts, all discovery was to conclude by April 3, 1992, and the [entitlement] hearing was re-scheduled to commence on June 15, 1992. The parties' stipulations were incorporated into a Board order dated February 11, 1992.

On February 28 the District filed its Identification of Proposed Expert Witness Testimony naming two witnesses, Sylvester C. Myers and Leo L. Fiander, as its proposed trial experts. The District represented that Myers, an expert in construction management, construction costs and design engineering, would testify that: K & W "was unable and/or unwilling to perform the work required under the subject contract"; it had failed "to submit a [timely] construction schedule by Critical Path Method (CPM)";[4] its "performance under the ... contract became progressively worse, resulting in increasing delays in critical path activity, such as ... begin Main Level Extension—140 calendar days behind schedule"; "there was little evidence if any of the contractor's compliance with the terms of the ... contract and/or the contracting officer's instructions"; and "the District was justified in terminating the contractor's right to proceed under the [Project] contract under Article 5 (default) of the General Provisions." The District asserted that Fiander, likewise an expert in construction cost and management, would testify that of the 141 logged change orders (requests by K & W to depart from the contract terms) "the significant number of these change orders were minor and could not have resulted in any delay in the completion"; and "the obvious reason for the delays in completion ... is the inefficient use of manpower [by K & W and] the inability to utilize the manpower available."

At their depositions in March of 1992, neither Myers nor Fiander could confirm the opinions attributed to them in the Rule 26(b)(4) statements. Although Myers initially asserted that the statement accurately reflected his opinions (subject to "refine[ment]"), he soon conceded that the critical comparison he intended to make between the "as planned" and "as built" completion schedules was not finished and until then he could not "form an opinion about K & W's fault":

> Q. You can't form an opinion today whether the default termination of Kora and Williams was justified?
>
> A. I cannot form that opinion.
>
> Q. Because you haven't completed your analyses, right?
>
> A. Exactly.
>
> Q. You may be 25 percent in your analysis; is that right?
>
> A. Approximately 25 percent.[5]

---

3. By agreement of the parties, discovery had been conducted under the appropriate Superior Court Rules of Civil Procedure.

4. The contract provided that K & W was to "utilize the Critical Path Method ... in planning, coordinating and performing the work under this Contract ...."

5. Later, again asked if he had an opinion yet "whether or not the termination of the contractor's right to proceed with the work was justified," he repeated: "I still do not have an opinion." He had been working on the key task of preparing a "CPM scheduling analysis" for about a month, but admitted that

As an example, Myers denied that he had "drawn [any] conclusion yet" why the Main Line Extension had started behind schedule. Asked generally whether he had "authorized anybody at the District to represent that it was your opinion that the default termination was justified," he stated: "I haven't authorized anybody, no." Fiander, for his part, stated that there were portions of the statement attributing opinions to him "that I don't agree with" and that in fact he had not authorized anyone to make representations "about the substance of [his] testimony." For instance, although his witness statement said that he would testify about 141 logged change orders, he actually had analyzed and would be testifying about only six.[6] He concluded with the extraordinary admission that "except for the last two sentences" of the witness statement (themselves conveying no opinions), "every other sentence [was] inaccurate and incorrect."

In May of 1992 K & W moved to sanction the District and limit the testimony of Myers and Fiander to what they had said in their depositions, asserting that the filed witness statements were a sham and that it would have no opportunity to depose the witnesses on any opinions they eventually reached. On May 19, when the parties exchanged exhibits, the District did not turn over the schedules that Myers had said he was preparing; indeed, it appears that the District withdrew scheduling charts Myers had done, stating they "will not be used."[7] Between the depositions of Myers and Fiander and the June hearing, the District submitted no revised state-

ments regarding either witness's opinions. The record in this court likewise contains no proffer of the opinions Myers or Fiander ultimately intended to give.

On June 15, 1992, the first day of the entitlement hearing, the Board granted K & W's motion to limit Myers' and Fiander's testimony to that given at their depositions. The Board found that neither witness "was prepared to go forward [at deposition] with . . . testimony concerning the opinions and conclusions they reached, with respect to various analyses of the project, for which they were hired." The Board was "extreme[ly] disappoint[ed] . . . at the conduct of the District . . . with respect to providing expert witness testimony and expert witness opinion prior to [the] hearing." Applying the multi-factor test for consideration of discovery sanctions announced by this court's decisions, the Board further found:

(a) that the District would not be "severely prejudiced" by the limitation on the two experts' testimony since it would "have the opportunity to present professional technical scientific testimony through other witnesses";

(b) K & W "would be clearly prejudiced" if Myers and Fiander were allowed "to provide their final conclusions at [the] hearing" without prior opportunity to be deposed concerning them; and

(c) "there was a willful disregard [by the District] of the Board's numerous . . . orders concerning its case of expert

---

"[i]t's about a six month project . . . six to eight months."

6. In an affidavit later submitted, Fiander qualified this statement by saying that although he had not seen the witness statement before its filing, he "had seen a list of the changes to this contract" and "considered the majority of those changes to be minor"; and that the "six items [he had] reviewed in depth included multiple change orders" covering a major portion of K & W's claim for damages. Even then, however, he expressed no opinion whether the default termination was justified.

7. Although we have not located in the record the amended list of exhibits on which this notation appears, the District in its brief does not dispute K & W's assertion that the proposed scheduling exhibits (1779, 1784, and 1785) were withdrawn. The Board itself later alluded to the District's "with [drawing] as a potential exhibit before the hearing on the entitlement portion" a report prepared by Myers concerning the critical path.

witnesses and expert witness testimony."

### b. *Discussion*

■ The Board's rules authorize the parties to conduct discovery according to the Superior Court's discovery practice. *See* General Rules of the Contract Appeals Board §§ 112–113, 36 D.C.Reg. ¶ 2693 (1989). The District does not dispute that the Board could order and enforce compliance with the expert witness disclosure requirements of Super. Ct. Civ. R. 26(b)(4).[8] As in the case of trial court action, this court will review the Board's imposition of a sanction only for abuse of discretion. *See* Super. Ct. Civ. R. 37(b); *Braxton v. Howard Univ.*, 472 A.2d 1363, 1365 (D.C.1984); *see generally Johnson v. United States*, 398 A.2d 354 (D.C.1979). On the record recited above, we have no basis for disagreeing with the Board that the District breached its duty of disclosure. An obvious purpose of Rule 26(b)(4) is to allow meaningful deposition of expert witnesses concerning their opinions. *See Mizrahi v. Schwarzmann*, 741 A.2d 399, 404 (D.C. 1999). But when deposed, neither Myers nor Fiander could state or be questioned about the opinions attributed to them by the District's counsel. Fiander went so far as to say the representations about his opinions were unauthorized. While Myers expressed some confidence his studies would bear out the opinions imputed to him, he conceded that he had not nearly completed those studies and in fact had no opinion on whether the default termination was justified. In essence, the opinions attributed to the witnesses were conjecture as to how they would testify and made the depositions a largely meaningless exercise. Moreover, the District never tendered final opinions of the witnesses or the grounds supporting them, in keeping with a party's duty seasonably to update discovery responses. Super. Ct. Civ. R. 26(f).

■ Sanctions available to a court for violation of Rule 26(b)(4) include exclusion of the testimony of the expert whose opinion was withheld. *Weiner v. Kneller*, 557 A.2d 1306, 1309–11 (D.C.1989); *see also Vincent v. Anderson*, 621 A.2d 367, 373 (D.C.1993). Admittedly, the limitations imposed on the testimony of Myers and Fiander amounted to exclusion of their testimony. But, although exclusion is "a severe remedy," *Weiner*, 557 A.2d at 1310 n. 5, our review nonetheless is confined to asking whether the Board abused its discretion in choosing that sanction. *Braxton, supra.* In performing that task we look to the following factors:

(1) whether allowing the evidence would incurably surprise or prejudice the opposite party;

(2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;

(3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;

(4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and

(5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

*Id.* at 1311–12; *see also Abell v. Wang*, 697 A.2d 796, 801 (D.C.1997).

■ We begin here—and, indeed, we go a long way toward concluding—with the second factor. The Board found that the District would not be seriously prejudiced by the exclusion of testimony by Myers and Fiander, because it could present other testimony by witnesses who took part in

---

8. Rule 26(b)(4)(A) provides in part:

(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

the construction about the reasons for the delayed performance.[9] The District responds that this finding ignored the key importance of the schedule analyses by its two independent experts—the counter-image, as it were, of the analyses by K & W's expert, Thomas C. Caruso, on which the Board ultimately relied heavily. The District, however, made no showing to the Board of how it would be harmed by excluding the opinions of these experts. By the time the Board ruled, and despite K & W's motion to exclude their opinions, the District had proffered no written opinions or supporting analysis by either witness. In affidavits attached to its opposition to K & W's motion to exclude testimony, filed a week before the hearing, neither Myers nor Fiander stated what his final opinion was or what he would testify to at the hearing. Nor had exhibits promised on behalf of Myers been turned over in the exchange of trial exhibits on May 19. In short, the opinions of the witnesses had not materialized by the time the Board ruled.

The District argues that its failure to proffer the experts' analyses was excused by K & W's argument to the Board that *it* would be prejudiced if the District could introduce their opinions without prior opportunity for deposition. The suggestion is that K & W thereby "admitted" the fact that the witnesses had final opinions, and should not be allowed to assert the contrary in this court. But an assertion by the party seeking exclusion that it will be harmed *assuming* the witnesses have eleventh-hour opinions is scarcely evidence that those opinions existed. The District, having violated its duty of discovery, had the burden of convincing the Board that the sanction proposed would endanger its case and so was disproportionate to the violation. *See, e.g., Techniarts Video v. 1631 Kalorama Assocs.*, 572 A.2d 1051, 1054 (D.C.1990) ("sanction imposed, [for discovery violation] should, wherever possible, be tailored to the offense"). Like any appellant, moreover, the District has the burden in this court of demonstrating how it was harmed by any error committed. *See* D.C.Code § 11–721(e) (1995). As the court has stated before: "To properly preserve excluded testimony for review on appeal, trial counsel must normally make an offer of proof. This offer of proof 'is not to meet a technical requirement but [is necessary] to lay the foundation for an affirmative showing of error.'" *District of Columbia v. Barriteau*, 399 A.2d 563, 569 (D.C.1979) (citations omitted); *see also Jamison v. United States*, 600 A.2d 65, 70 (D.C.1991). On a record before the Board (and the court) containing no indication of what opinions Myers and Fiander ultimately held and why, the District asks us to reverse without any assurance that it would even utilize these witnesses at a new hearing.[10] If anything, the record indicates that the District had lost—if it ever possessed—any confidence in the utility of their opinions.

The other *Weiner* factors likewise weigh against reversal. The District argues that any harm to K & W from the belated disclosure of the opinions could have been cured by lesser means, *i.e.*, a continuance and renewed depositions at government expense. This argument fails because, in the absence of exhibits or even a proffer of opinion by either witness, there is no rea-

---

9. As K & W points out, for example, engineers of Sverdrup, the project designer and construction manager for the District, testified to their opinions and analyses of the scheduling and other matters.

10. As pointed out, the District withdrew an "as built" analysis by Myers before the entitlement hearing; and, as the Board later noted, when K & W sought that analysis for use in the quantum hearing, the District's counsel stated that he had not seen it for a long time and did not know if it still existed—slim proof that the government attached any value to Myers' opinion. Indeed, an expert for the District at the quantum hearing opined that he had seen "no probative value to those documents [*i.e.*, bar charts Myers had prepared]."

son to suppose new depositions would have been more than a reprise of the earlier ones.[11] Rescheduling a hearing for which the Board had blocked out large portions of the summer (the District alone had announced some 46 witnesses) was not compelled in these circumstances. Moreover, and perhaps most important, the Board had lost patience with the District's failure to meet deadlines and provide discovery as required, conduct the Board ultimately found "willful." The District argues that this finding is unfair because key portions of the delay in providing discovery stemmed from the heart attack and retirement of its lead attorney in November 1991 and the cumbersome need to obtain advance federal approval to engage expert witnesses,[12] delays over which it had little control. But at least three things undercut this argument. First, is the inexplicable fact that not until July 1991, fully four years after K & W was terminated for default, did the District's counsel in the case first notify his superiors that experts would be needed—this despite demands by K & W from early on for disclosure of the witnesses' identity. Second, after successive Board orders requiring disclosure by a date certain, the District agreed by binding stipulation to disclose the names and opinions of the experts by the end of February 1992, then failed, essentially *never* revealing their opinions. Third, and most disturbing to the Board, was the Rule 26(b)(4) statements themselves which the District submitted in February but which the experts in large part disavowed at their depositions and the Board—without putting too fine a point on it—found to be bogus. The Board's conclusion in these circumstances that the District had willfully failed in its discovery obligations is supported by the record, further justifying its choice of sanction.

We find no error in the Board's limitation on the testimony of Myers and Fiander.[13]

### 2. *The Caruso Exhibits*

■ Thomas Caruso, an engineer and K & W's primary witness at the entitlement hearing, gave detailed expert testimony about the delays in the construction project and the responsibility for them. His delay analysis was embodied in a series of exhibits summarizing the critical path for the project (also referred to as the "as planned" schedule) and separate "as built" schedules, combined with a delay analysis for the link structure, the lower track access, and the main level extension and parking garage. The District, pointing to what it considers the mirror image of *its* experts' failure to disclose their opinions, argues that the Board erroneously refused to sanction K & W for failing to produce Caruso's exhibits at his deposition on March 31, 1992. The District objected at the hearing and asked that the exhibits be excluded. The Board admitted them, finding no prejudice to the District. The District's argument here, we conclude, suffers just as starkly from a failure to demonstrate how it was prejudiced by the Board's ruling.

Although K & W admits that the exhibits were substantially finished by the time Caruso was deposed, it contends that as *trial* exhibits—graphic illustrations of Caruso's delay analyses—it had no duty to disclose them before the scheduled exchange of trial exhibits in May, and further that the District gave untimely notice of its need for them before the deposition, specifically violating the 30–day requirement of Super. Ct. Civ. R. 30(b)(5). The latter argument strikes us as unduly, indeed, almost absurdly, technical on this

11. Similarly, the absence of prejudice demonstrates why the Board had no basis for crediting the argument that exclusion affected the completeness of the information before the tribunal (the fifth *Weiner* factor).

12. The Union Station contract was funded by the Federal Highway Administration.

13. For the same reasons, the Board properly extended the sanction of exclusion to include rebuttal testimony by Myers and Fiander.

record,[14] but the first argument gets us to the essential weakness of the District's argument for reversal. The voluminous record before us includes the transcript of only a small fragment of Caruso's deposition, which lasted a day or more. There is no indication that the District sought to make the rest of the deposition part of the record before the Board. Thus it is impossible for us to determine what opportunity the District had to probe the basis for Caruso's opinions at his deposition. That obviously is crucial, because if the exhibits the District ultimately objected to were visual representations of schedule analyses and conclusions that *were* explored at his deposition, the District cannot legitimately claim prejudice from the admission of demonstrative aids of this kind at the hearing. In other words, the District cannot persuade us on this record that the unavailability of the exhibits kept it from questioning Caruso as extensively as it desired at deposition about the basis for his opinions.

Moreover, since the deposition certainly allowed the District to ask whether Caruso had prepared supporting schedules and exhibits, one would expect it to have moved to compel their production thereafter if it thought itself harmed by the failure to turn them over. Yet it did not do so, as the Board pointed out. (The District's response that K & W admitted to only one such exhibit at the deposition is unconfirmable without a transcript, and does not explain the failure to seek an order to disclose *that* exhibit). In any case, the District received all of Caruso's schedules in the exchange of trial exhibits a month before the hearing and some ten weeks before Caruso took the stand on August 3.[15] In these circumstances, we cannot find an abuse of discretion in the Board's allowing Caruso to use the exhibits at the hearing.

■ The District's related argument that the Board erroneously refused to let Evans Barba, an engineer retained on the eve of (if not during) the hearing, be present at Caruso's testimony and testify in rebuttal fails for similar reasons. Since Barba was not disclosed as an expert under Rule 26(b), the Board was concerned with the unfairness of allowing him to give opinions formed only during the hearing and without prior occasion for K & W to depose him. Yet the Board did not prevent Barba from testifying in rebuttal (stating "you may call anyone you wish on rebuttal"); it only precluded him from relying on Caruso's in-hearing testimony. That testimony, as the District admits, consisted heavily of Caruso's conclusions embodied in his schedule analyses which the District had possessed since May 19. The District therefore was not prevented (except perhaps by its own delay in retaining the witness) from calling Barba to rebut the opinions embodied in those schedules. And, since it never called him to the stand, we cannot determine how any opinions he might have offered were weakened by his inability to take account of Caruso's actual testimony. As before, we are not persuaded that the District was prejudiced by the Board's ruling.[16]

14. As the District points out, it served its notice to take Caruso's deposition and for documents and exhibits supporting his opinions two days after K & W identified its experts.

15. The fact, as the District points out, that the exhibits were "non-conforming" because they were in black and white rather than color-coded as presented at the hearing is not cognizable prejudice.

16. The District also contends that it was prejudiced by K & W's failure to disclose at or before the hearing payments which the company had made to Peter A. Warner and Royce C. Fitzgerald, company engineers who gave expert testimony. The District does not dispute that it had been able to depose these witnesses about their knowledge and opinions, but argues that the undisclosed evidence of payments deprived the Board of important evidence of bias. We doubt first whether ignorance of the payments affected the ability of the Board members—possessing "particular expertise in this area [of government contracts]," *Dano Resource Recovery v. District of Columbia,* 620 A.2d 1346, 1351 (D.C.1993)—

## B. Burden of Proof and Merits of the Entitlement Decision

The District argues that at the entitlement hearing the Board improperly placed the burden of proof on the government to prove that the contractor's delays were not excusable. It asserts that "the uniform rule applied in contract terminations under the standard termination for default clause has been that excusable delay is an affirmative defense that the contractor must plead and prove." [17] K & W, citing its own authorities, counters that "the government ultimately must bear the burden of persuasion that any delays were not excusable, although the contractor may have the burden of going forward with evidence that delays were excusable." This court's decision in *Dano Resource Recovery, supra* note 16, sent somewhat mixed signals on the issue. Preliminarily, we pointed out that because "a default termination is a severe remedy, we must ultimately be satisfied that the District had 'solid grounds' for the termination," 620 A.2d at 1352 (citations omitted)—language strongly implying that doubts will be resolved against the District. But later, in rejecting a claim by the contractor that the District had "contribute[d] to the circumstances giving rise to the default" (*i.e.*, by furnishing it with sludge for processing that had too high a water content), *id.* at 1359, we wrote broadly in a footnote that "Dano ... has the burden of showing that its default was excusable." *Id.* at 1360 n. 25 (citation omitted). Federal decisions are likewise not of one piece on the burden issue. *Compare, e.g., Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 764–65 (Fed. Cir.1987) (government bears the ultimate burden of proof on the issue of the correctness of its actions in termination for default), *with DCX, Inc. v. Perry,* 79 F.3d 132, 134 (Fed.Cir.1996) (citing, with apparent approval, allocation of burden in Armed Services Board of Contract Appeals' finding "that the government met its burden of proving that DCX did not perform in a timely fashion, and that DCX failed to meet its burden of proving that its nonperformance was excusable").

■ This case, however, does not require us to resolve the question of burden of proof. Although the Board nominally placed the burden on the District to prove K & W's fault in not meeting the completion deadlines, one finds no indication in its opinion that allocation of the burden of proof would have made a difference in the outcome. In the usual civil case (such as this) where the standard of proof is a preponderance of the evidence, a misallocation will likely be consequential only where the evidence approaches equipoise, *i.e.*, "[w]here proven facts give equal support to each of two inconsistent inferences." *Pennsylvania R. Co. v. Chamberlain,* 288 U.S. 333, 339, 53 S.Ct. 391, 77 L.Ed. 819 (1933). Here the Board found the default termination unjustified on multiple grounds. Its findings and conclusions as to most of these reveal no hesitation about where the preponderance of the evidence lay. For example, the Board found the record "replete with contemporaneous admissions by the District that it knew full well that K & W's lack of progress was caused by excusable delays"; that

to carefully evaluate the witnesses' opinions. Nor does the testimony of these witnesses make more than a minor appearance in the Board's lengthy findings. The District's belated argument in its reply brief that knowledge of the payments might have caused the Board to exclude Caruso from counsel table as K & W's party representative (in favor of Warner or Fitzgerald) leaves us unimpressed, if for no other reason, because we are not shown how Caruso's opinions—resting so heavily on his schedule analyses—were plausibly improved by hearing the testimony of the District's witnesses. We note that the Board's ruling with respect to Evans Barba did not prevent the District from similarly having *him* at counsel table to provide expert assistance.

17. Article 5.1 of the instant contract, standard in construction contracts of this type, stated that "delay in the completion of the work ... [must arise] from unforeseeable causes beyond the control and without the fault of the Contractor."

it was "indisputable that K & W should have been granted time extensions to the July 15, 1987, [revised completion] date for excusable delays that occurred during 1987"; that the District terminated the contract "without doing *any* analysis of excusable delays to the [Main Level Extension] during 1987" (Board's emphasis); and that "[t]he evidence is overwhelming that K & W failed to receive credit for *all* time extensions to which it was entitled prior to termination" (Board's emphasis), the District having made "virtually no effort to analyze and allocate fault for delays or resolve the many major outstanding change orders until *after* it had terminated K & W" (Board's emphasis). Most telling in this regard are the Board's conclusions that "the evidence is overwhelming that [the District's Contracting Officer] abdicated responsibility for the decision to terminate" and that "[t]he evidence . . . compels us to find that the decision to default terminate K & W was improperly motivated," a "pretext" for termination "found necessary on other grounds." See pages 695–96, *infra.* If the evidence supported these findings—if it only approximately supported the Board's assessment of how lopsided the evidentiary tilt was—then the allocation of the burden of proof could not reasonably have affected its decision.[18]

The District goes on to attack the Board's various grounds for declaring the default termination unlawful. It is unnecessary for us to consider each of these grounds; several are related and, if sustainable on the record, fully justify the Board's decision. Specifically, the Board's finding that K & W's failure to meet the original completion dates as well as the revised ones (assuming new dates had been properly set)[19] was excused bears close relation to its finding that the District failed to analyze and allocate responsibility for delays, and its further finding that the termination was improperly motivated and an abuse of discretion. This tripartite conclusion that the District disregarded—in part for ulterior reasons—objective justifications for the delays in completion is at the heart of the Board's decision. Neither the record nor the arguments made by the District give us any basis for disturbing it.

The District argues, for instance, that K & W flooded it with unfounded change orders and time extension requests that made timely processing of them impossible. But the Board found the District in no position to make such a claim when it

---

**18.** The District also argues that the Board erroneously limited its proof by requiring it to support the default termination on grounds stated in the termination letter and on facts known to the District at the time of termination. *See, e.g., College Point Boat Corp. v. United States,* 267 U.S. 12, 15–16, 45 S.Ct. 199, 69 L.Ed. 490 (1925) (party sued for breach of contract may defend on grounds that constituted adequate cause for termination even if unknown to it at the time.) At issue is an "as built" analysis done by Sverdrup engineers which the Board appeared to exclude as irrelevant because "it wasn't prepared to support the default termination." It is not clear to us, however, that the Board excluded the exhibit because of *when* it was prepared (*i.e.,* before or after termination) rather than because of uncertainty over *why* the District was offering it—confusion prompted partly by the District's counsel twice stating that the exhibit was not being offered "for the proof of what is contained in

there." The results of the Sverdrup analysis were never proffered to the Board, *see Barriteau, supra,* and given trial counsel's assertion that it was not being offered for the truth of its contents, we simply cannot understand the District's argument that exclusion of the analysis denied it important "opinion evidence relating to excusable delay." Indeed, the witness whom the District sought to question about the analysis admitted that it "could be just a beginning as-built schedule" which he had "never reviewed . . . for completeness."

**19.** The Board separately found that the District had waived the original contract completion dates and failed to establish valid new ones. We assume without deciding—as the Board itself assumed elsewhere—that the District properly established new completion dates of July 15, 1987, for the link structure and November 1987 for overall completion.

had not even attempted to evaluate most of these requests:

> The District [the Board said] does not seriously argue, nor can it, that it attempted to process K & W's claims and proposed change orders during contract performance. At the time of termination, there were at least 193 change orders and claims for which processing had not yet begun.

Further, on the strength of findings of fact covering ten pages, the Board concluded:

> [T]he District privately acknowledged that K & W was entitled to time extensions of six months, nine months, a year and 450 days, yet never granted any of these extensions to the contract completion date. The reason no extensions were granted was simply that the District never bothered to analyze K & W's pending time requests.

We are not persuaded that these findings are clearly erroneous. *See* D.C.Code § 17–305(a) (1997). As to the District's further argument that it had no duty to analyze extension requests because K & W breached its obligation to provide initial and updated CPM schedules showing proposed changes to the "critical path," the Board found that K & W had submitted and the District had approved initial CPM schedules, and that K & W submitted revised schedules during the construction but "the District simply did not act upon the CPM submissions—either by approving, rejecting or modifying them." Again, these factual determinations are supported by evidence in the record, and may not be overturned.

 Finally, the District attacks the Board's findings that the contracting officer relinquished his responsibility for the default decision to the then City Administrator Thomas M. Downs, and that the decision was made largely for pretextual reasons unrelated to fault by K & W. The Board correctly understood that, since government officials are presumed to act in good faith, K & W had to prove bad faith by the District by well-nigh "irrefrag-

able proof." *Dano Resource Recovery, supra* note 16, 620 A.2d at 1361 (quoting *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1301 (Ct.Cl.1976)). But the Board explained at length why "[t]he evidence ... compel[led it] to find that the decision to default terminate K & W was improperly motivated":

> The evidence shows that by the spring of 1987, the District was experiencing a cash flow problem on the contract. The money the District owed K & W on the balance of the contract, combined with the estimated value of change orders and claims, would far exceed the balance remaining in the budget set by the Congress and FHWA [the Federal Highway Authority]. The unpaid change orders and claims ran into the millions of dollars. If K & W had not been terminated, the money paid by the FHWA on the claims and change orders would have rightfully gone to K & W rather than to the District. Thus, by terminating K & W, and afterwards processing the claims and change orders, the thought was that those monies would be the District's to keep. Thus, the District's method of funding the work was to skirt appropriate funding mechanisms by terminating K & W so that the revenue from the changes that had accrued would remain with the District. The District's funding problem would be further eased by a default termination because the bonding company (INA) might be forced to pay to have the Project completed, obviating any budgetary shortfall.
>
> The evidence also shows that equally important to the District, in the spring [of] 1987, was that USRC [the Union Station Redevelopment Corporation] was threatening to assert large claims against the District for damages of more than $6 million if the Link and the Garage were finished late. At the June 8, 1987, USRC board meeting, Thomas Downs was notified that if the Link were not completed by July 15, 1987, the District might be liable for an additional

$50,000 per week which the USRC would owe to its contractor, Dick Corporation. At the same meeting, Downs estimated that the Link would not be completed until mid-October, virtually guaranteeing, at least in his mind, that USRC's threatened damages might come to pass.

In addition, in spring 1987, USRC not only threatened the District with enormous claims, but also began campaigning to have the District terminate K & W. By June 1987, Keith Kelly had informed Downs that the *only* solution to USRC's scheduling and financial problems—the damages for which it would pass on to the District—was to terminate K & W. Later, the USRC Board formally recommended to the District that K & W be terminated.

As a result of these financial and political pressures, Downs, on June 17, 1987, made the expedient decision and ordered the default termination of K & W. Entitlement to time extensions, a time adjustment for change orders, excusable delay and responsibility for delay were never really considered as part of the termination decision—even though lack of progress was later cited in the June 19, 1987, termination letter as the basis for the termination.

In sum, the District used the TERMINATION-DELAYS Clause as a pretext to: (1) obtain additional funds from FHWA based on K & W's outstanding claims and change orders; (2) obtain reprocurement funds from INA; and (3) appease USRC, which was threatening to assess damages against the District.

This is harsh criticism of the District's officials, who in a real sense found themselves between the "rock" of delays inher-

ent in a complex project over which it had only limited control[20] and the "hard place" of external pressures to accelerate completion or, failing that, blame K & W. But in taking issue with the Board's critique, the District disputes only part of the evidence from which the Board drew its conclusion of improper motivation. Even discounting, for example, the Kelly memorandum of November 19, 1986 (Kelly was president of the Union Station Redevelopment Corporation) as revealing an intent by the District to use funds owed K & W for completion of other work, the mass of evidence summarized in the Board's findings 429 through 448[21] leaves us unable to reject its conclusion that the termination decision was "shaped by ulterior motives," *John A. Johnson Contracting Corp. v. United States,* 132 F.Supp. 698, 706 (Ct.Cl.1955), rather than a reasonable exercise of the contracting officer's discretion. *See Darwin Constr. Co. v. United States,* 811 F.2d 593, 596 (Fed.Cir.1987).

## C. *Quantum*

In the complaint filed in its appeal to the Board, K & W asked the Board to "set aside the District's termination for default, convert [the] termination into a termination for the convenience of the District, [and] award K & W an adjustment to the Contract price pursuant to Article 6 thereof." Two months before the entitlement hearing, the parties jointly filed a Consent Order of Bifurcation stipulating that the hearing "will deal only with entitlement issues," and that the parties would "meet promptly following the entry of this Order to explore the means of resolving the issues regarding quantum, it being the parties' goal *to expedite any further hearings (on quantum)* that might be necessary in

---

**20.** AMTRAK's needs, for example, clashed with the District's in regard to track closures during the construction.

**21.** The Board pointed, for instance, to a June 8, 1987, meeting of the USRC Board of Directors at which City Administrator Downs commented that he had received instructions from members of Congress not to request

additional funding for the project, and that "one of the alternatives considered by DCDPW [District of Columbia Department of Public Works] was to terminate the contract with [K & W] and force the surety company to manage the remaining portion of the contract ...."

this case" (emphasis added). Consistent with this desire to expedite, the Board on December 2, 1992, authorized discovery on quantum to begin on December 23, 1992, following post-hearing briefing on entitlement but before a decision was rendered on that part of the case. In the March 1994 entitlement decision, the Board gave the parties until June of that year (plus any additional time they might need) to negotiate a settlement on termination costs. When that failed, the Board held a quantum hearing in December of 1994, and in September of 1996 issued its 35-page decision awarding costs.

The District does not challenge any aspect of the Board's computation of the award. Instead it argues that the Board violated Articles 5 and 6 of the contract as well as applicable regulations by asserting jurisdiction over the quantum phase before K & W had exhausted its administrative remedies by submitting its damage claim to the contracting officer and appealing an adverse decision to the Director of the Department of Administrative Services, as then required by law.[22] The District contends that the Board's failure to require adherence to the contract and regulations deprived the contracting officer of a reasonable opportunity to conduct discovery on K & W's claim. We reject both parts of the District's argument. K & W properly exhausted its administrative remedies, and the District suffered no impairment of its ability to challenge K & W's claim for costs.

■ As explained at the beginning, K & W filed its claim with the Department of Administrative Services in 1988 seeking conversion of the termination to one for the convenience of the District.[23] Only after an appeal was authorized by an administrative "deemed denial" did K & W appeal to the Board, requesting change to a convenience termination and corresponding adjustment of the contract price. We agree with the Board that at that point it had jurisdiction over both the entitlement and quantum aspects of K & W's claim. *See* D.C.Code § 1–1189.3(a)(2) ("The Board shall ... have jurisdiction to review and determine de novo ... [a]ny appeal by a contractor from a final decision by the contracting officer on a claim by a contractor"); *cf. Boeing Co. v. United States,* 31 Fed. Cl. 289, 295 (1994) (Court of Federal Claims has jurisdiction over claims presented to and denied by contracting officer; a "claim" is an assertion in writing that contractor is entitled to a sum certain because the government's default termination was wrongful). As the Board pointed out, if the Director had ruled correctly on the request for conversion he would have proceeded to award appropriate termination costs; but since the Director "effectively denied [K & W's] request to convert the default to a convenience termination and thereby denied *any* recovery to [K & W], the Board [then] ... properly exercised jurisdiction over both entitlement and quantum" (emphasis in original). Indeed, the District did not move to sever the two issues on

---

**22.** Article 5 of the contract's general provisions stated that when "for any reason" a default termination is converted to a convenience termination, a contractor's recovery is to be determined under Article 6 (the Convenience Termination clause). Article 6 requires that "[a]fter receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer his termination claim, in the form with the certification prescribed by the Contracting Officer." The controlling regulations gave the contracting officer broad authority to determine the amount due a contractor upon termination for convenience; *see* 27 DCMR § 3703.1 (1988), including—when

a settlement could not be reached—a computation of the amount due "[a]fter reviewing any evidence submitted by the contractor and other available information." 27 DCMR § 3705.3. Former D.C.Code § 1–1188.5 (1992) required all contractor claims to be appealed to the Director, Department of Administrative Services, as a condition of review by the Board.

**23.** This followed an initial appeal to the Board which K & W voluntarily withdrew after the District argued that K & W had not exhausted its administrative remedies.

jurisdictional grounds; instead it stipulated to their bifurcation and to negotiations on quantum while the entitlement hearing took place. The Board thus remained seized of the quantum issue when the negotiations between the contracting officer and K & W failed. *Cf. Boeing Co.*, 31 Fed. Cl. at 296 (practice of bifurcating entitlement and quantum portions of challenges to default terminations "reflects a practice based on prudential concerns" and is not jurisdictional nor "a requirement of the [standard] default clause").

Moreover, K & W pursued its administrative remedies not once but twice. In the March 1994 entitlement decision, the Board postponed the quantum hearing to again allow negotiation of a settlement on termination costs. K & W had presented its monetary claim to the contracting officer in September 1993 and again (as certified by its accountants) in December of that year; thereafter, as directed by the Board, the contracting officer's representatives and K & W negotiated through the summer of 1994 and beyond. Only in December, when no administrative resolution had been reached, did the Board convene the quantum hearing. On this record, to require still more in the way of exhaustion would turn the vital purposes of that doctrine—including the expedited resolution both parties had sought—into a mere excuse for delay in ultimate decision.

■ The District denies that the contracting officer had a fair opportunity to resolve the quantum issue, asserting that K & W thwarted the discovery process in part by waiting until late December of 1993 to turn over 29 boxes of database-related documents, un-indexed, shortly before the scheduled depositions of the District's accountants. K & W responds that its records had been available to the District as early as April 1993 and that the

District simply ignored them (the Board itself noted that the District had not "beg[u]n quantum analysis until after it received [K & W's] termination proposal of September 22, 1993)." Just which party was responsible for the pace of discovery during 1993 is ultimately not important, because the quantum hearing did not begin until almost a year later. During that time, as the Board pointed out, the District was given "[a]dditional opportunities for discovery" up to and even after the hearing, including "a supplemental opportunity [in October] to depose the other party's experts." The Board thus concluded that "the District's asserted procedural and policy concerns for allowing the contracting officer to consider [K & W's] termination settlement proposal and backup were fully satisfied." We see no reason to disturb that conclusion.

As stated before, the District does not attack any of the individual costs awarded to K & W or the overall reasonableness of the amount. It also was not denied a fair opportunity to challenge K & W's damage claim either administratively or before the Board.[24] Finally, since we have concluded that the Board's judgment on entitlement must be upheld, the decision converting the termination to one for the convenience of the District and awarding K & W costs with interest is

*Affirmed.*

---

**24.** The District argues that the Board erroneously disqualified one of its experts at the quantum hearing on grounds of an irreconcilable conflict of interest. Once more, however, it is impossible for us to evaluate any claim of prejudice from the exclusion (the District articulates none in its brief) because no proffer was made to the Board of the witness's expected testimony.