**INSURANCE COMPANY OF NORTH AMERICA, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 05–CV–672.

District of Columbia Court of Appeals.

Argued June 28, 2006.
Decided May 29, 2008.

See also 743 A.2d 682.

Eric W. Bloom, with whom David C. Romm, Gene C. Schaerr, and Ryan S. Spiegel, Washington, DC, were on the brief, for appellant.

William J. Earl, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time, and Edward E. Schwab, Deputy Attorney General at the time, were on the brief, for appellee.

Before REID and FISHER, Associate Judges, and BELSON, Senior Judge.

FISHER, Associate Judge:

In 1987 the parties reached a partial settlement of an ongoing dispute over the District of Columbia's termination of a construction contract for the redevelopment of the historic Union Station. In one of the provisions, the District agreed that, if it were later found to have been at fault, it would reimburse the Insurance Company of North America ("INA") for various costs, fees, and expenses. When it later was asked to fulfill that pledge, the District refused, eventually arguing that it could not lawfully comply because the Anti–Deficiency Act forbids government officials to spend or obligate funds that have not been appropriated. Litigation ensued, and the Superior Court granted summary judgment to the District of Columbia. We affirm.

## I. The Anti–Deficiency Act in Brief

"In light of the principles now codified at 31 U.S.C. § 1341 [known as the Anti–Deficiency Act ("ADA")], the Supreme Court of the United States and other federal courts have explicitly and repeatedly held that all contracts for future payments of money, in advance of or in excess of existing appropriations, are void ab initio."[1] *Williams v. District of Columbia,*

902 A.2d 91, 94 (D.C.2006) (citing *Hercules, Inc. v. United States,* 516 U.S. 417, 427, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (other citations omitted)). Under this statute, "[w]ith one peculiar exception that the Comptroller General expressly sanctioned, 'the accounting officers of the Government have never issued a decision sanctioning the incurring of an obligation for an open-ended indemnity in the absence of statutory authority to the contrary.'" *Hercules,* 516 U.S. at 427 n. 10, 116 S.Ct. 981 (quoting *In re Assumption by Government of Contractor Liability to Third Persons—Reconsideration,* 62 Comp. Gen. 361, 364–65 (1983)).

## II. The Problematic Contract

Congress enacted the Union Station Redevelopment Act of 1981 in order to restore and expand the historic Union Station. Allocating tasks, it "gave the District of Columbia responsibility for completing the parking structure and developing railroad access facilities...." *District of Columbia v. Kora & Williams Corp.,* 743 A.2d 682, 685 (D.C.1999). Congress authorized the District to spend $40 million for design and construction, and the District's Department of Public Works accepted the bid of the Kora and

---

1. The Act states in part that "[a]n officer or employee of the United States Government or of the District of Columbia government may not make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation," 31 U.S.C. § 1341(a)(1)(A) (2000), or "involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B) (2000). *See also* D.C.Code § 1–204.46 (2001) ("no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act").

Although the District of Columbia has its own version of the ADA, D.C.Code § 47–355.01 *et seq.* (2007 Supp.), the federal act governs here for two independent reasons. Congress provided funds from the federal purse for the Union Station Redevelopment Act of 1981, Pub.L. No. 97–125, § 118(a), 95 Stat. 1667, 1672 (1981) ("The Federal share shall be 100 per centum of the total cost of such project."). Moreover, at the time this agreement was entered, District of Columbia law acknowledged that the federal act applied to District officials. *See* D.C.Code § 47–313(e) (1981). The District's own version of the ADA did not become effective until April 4, 2003, well beyond the date the agreement was made. *See* D.C. Law 14–285; D.C.Code § 47–355.01 *et seq.* (2007 Supp.).

Williams Corporation ("K & W") to perform the construction work for approximately $25 million.

"From the beginning, ... the construction work was beset with problems stemming from design." *Kora & Williams,* 743 A.2d at 685. "Additional problems developed during construction with the installation of the skylights and supporting structures, pile driving operations, AMTRAK's refusal to vacate certain offices, and denial of access to an active track spur that serviced the nearby United States Government Printing Office, all problems which affected the planned overall construction sequence known as the 'critical path.'" *Id.* As a result, it became impractical to complete the project by the deadlines set in the contract. *Id.*

On June 19, 1987, the District terminated the contract, citing K & W's failure to make sufficient progress towards timely completion. *Id.* The District then made a claim against the performance bond issued by INA, which had served as K & W's surety. K & W asserted that the delays were not its fault, and the parties began litigation. *Id.*

In November 1987, the District and INA executed a partial settlement agreement (the "Repayment Agreement") under which INA agreed to pay the District $12,869,460. In exchange, the District released INA from its obligations under the performance bond. However, if it ultimately were determined that the termination of K & W "was not justified," the District would repay the $12,869,460, plus interest, and would "reimburse INA for all reasonable, necessary and properly documented costs, fees and expenses incurred

by INA as a result of or in connection with the termination of [K & W] by the [District.]" Both parties "represent[ed] that they [were] fully authorized and empowered to enter into" the agreement.

On March 7, 1994, the Contract Appeals Board ("CAB") concluded that the District's "default termination decision was arbitrary and capricious and an abuse of discretion and should be converted into one for the convenience of the District." This court affirmed the CAB's decision. *Kora & Williams,* 743 A.2d at 698. Thereafter, INA demanded that the District honor its obligations by repaying the $12,869,460, plus interest, and reimbursing the "costs, fees and expenses" INA had incurred as a result of the District's improper termination of K & W. The District consented to judgment for $12,869,460, plus interest, but disputed that it owed INA $17,372,716.55 for "costs, fees and expenses." [2]

INA filed suit against the District, alleging a breach of the Repayment Agreement. In a thoughtful opinion issued in May 2005, the trial court granted summary judgment in favor of the District, concluding that the reimbursement agreement was void because it violated the ADA. This appeal followed.

### III. Our Standard of Review

■ "In reviewing a trial court's grant of summary judgment, we make an independent review of the record and employ the same standards as does the trial court in initially considering the motion." *EastBanc, Inc. v. Georgetown Park Associates II, L.P.,* 940 A.2d 996, 1001 (D.C. 2008) (quotation marks and citation omit-

---

2. According to INA, this amount included the costs involved in settling "numerous claims directly relating to the Union Station as well as claims brought against other bonds guarantying K & W's performance and payment of vendors on several other contemporaneous projects," and "extensive" participation in K & W's bankruptcy proceedings. INA's counsel later informed the District that it would reduce its claim to $10.7 million.

ted). "We therefore must determine whether the party awarded summary judgment demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. We view the record in the light most favorable to the non-moving party." *National Association of Postmasters of the United States v. Hyatt Regency Washington*, 894 A.2d 471, 474 (D.C.2006) (quotation marks and citation omitted).

### IV. Open-ended Indemnification Clauses Violate the Anti–Deficiency Act

At first blush, it might appear that summary judgment was premature. Congress appropriated $40 million for expenses that were "necessary to complete" the redevelopment of Union Station. Pub.L. No. 97–125, § 118(a), 95 Stat. at 1672 ("The amount of such apportionment necessary to complete such project, not to exceed $40,000,000, shall remain available to the District of Columbia until expended....") It seems plausible that at least some of the expenses claimed by INA were covered by the appropriation-that is, that they were "necessary to complete" the Union Station project. Moreover, the record before us does not establish that the entire appropriation has been spent. Perhaps it is a disputed issue of material fact whether the amounts claimed by INA are covered by the appropriation,[3] and whether the funds obligated by the District exceed the amount appropriated. *See Union Pacific R.R. Corp. v. United States*, 52 Fed.Cl. 730, 733 (2002) (court could not state as a

matter of law what obligations are "necessary expenses" of "property management").

 However, these arguments are foreclosed by the principle previewed above-that open-ended indemnity clauses violate the ADA. *See Rick's Mushroom Service, Inc. v. United States*, 521 F.3d 1338, 1346 (Fed.Cir.2008) ("As recognized by the Court of Federal Claims, ... the contracting officer had no authority to enter into an open-ended indemnity agreement....."); *E.I. Du Pont de Nemours & Co., Inc. v. United States*, 365 F.3d 1367, 1374 (Fed.Cir.2004) ("We do not question the trial court's reasoning, ... [that] the ADA ... bars the enforcement of express open-ended indemnification clauses."). Such clauses violate the ADA because "[t]here is no possible way to know at the time the contract is signed whether there are sufficient funds in the appropriation to cover the liability if or when it arises because no one knows in advance how much the liability may be." *In re Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp. Gen. at 366.[4] As the trial court recognized, the clause at issue here was indeed open-ended-"[t]he agreement contained no explicit, or even implicit, statement of a maximum liability, and it included no attempt to limit the District's liability to the amount remaining in the initial appropriation at the time the agreement was reached."

---

**3.** Indeed, INA concedes that at least some portion of the amount it seeks to recover was "incurred in connection with K & W bonded projects *not directly related* to the Union Station project." (Emphasis in original.)

**4.** Courts have recognized that the decisions of the Comptroller General, "while not binding, are 'expert opinion[s], which [courts] should

prudently consider.'" *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1084 (Fed.Cir.2003) (citing *Delta Data Systems Corp. v. Webster*, 240 U.S.App. D.C. 182, 186, 744 F.2d 197, 201 (1984)); *accord, Association of Civilian Technicians v. Federal Labor Relations Authority*, 348 U.S.App. D.C. 112, 116, 269 F.3d 1112, 1116 (2001).

## V. INA's Arguments

INA attempts to avoid the conclusion that the indemnification clause is unenforceable. First, it asserts that the Repayment Agreement "falls outside of the ADA" because (1) it was not a contract for goods and services, and (2) the District had sole control over the costs and expenses to be reimbursed. In the alternative, INA argues that the "judgment fund" is the supporting appropriation demanded by the ADA. Finally, even if the ADA voids the Repayment Agreement as written, INA urges this court to interpret the document in light of "general contracting principles" or to equitably reform the agreement. We consider these arguments in turn.

### A. Does the ADA Apply Only to Contracts for "Goods or Services"?

■ Nothing in the plain language of the ADA suggests that it applies only to payments for "goods and services." Those words do not appear in the text. Rather, sections 1341(a)(1)(A) and (C) restrict a government officer's power to "make or authorize an expenditure or obligation," and § 1341(a)(1)(B) refers to a "contract or obligation." The statute does not define "expenditure," "obligation," or "contract," however. Citing some Congressional debates (the most recent of which occurred more than a century ago) and a few opinions from the Comptroller General, INA argues that these terms should be read to encompass only contracts for goods and services. We reject this argument for several reasons.

INA's narrow construction of these terms is not a natural one.[5] Moreover, its interpretation makes little sense as a matter of public policy. Financial commitments like the one at issue here may involve huge sums of money. Exempting them from the statute's coverage would undermine the very principles on which the ADA is based.

We have examined the legislative debates cited by INA, and they do not support, let alone compel, its reading of the ADA.[6] More importantly, many cases, including one decided by the Supreme Court, have applied the ADA to the type of indemnification agreement that appellant seeks to enforce here. *See, e.g., Hercules,* 516 U.S. at 427, 116 S.Ct. 981 (agency may not agree to open-ended indemnity for third-party liability); *California–Pacific Utilities Co. v. United States,* 194 Ct.Cl. 703 (1971) (public utility sought to recover the funds expended by its insurer to settle a claim); *National R.R. Passenger Corp. v. United States,* 3 Cl.Ct. 516, 521 (1983) (ADA not violated because indemnification limited by contract to amount appropriated for that purpose).

INA principally relies on a general definition provided by the Comptroller General in *In re Committee on Appropriations,* B–116795, 1954 U.S. Comp. Gen. LEXIS 837 (June 18, 1954). Focusing on the difficulty of determining when an obligation is in-

---

5. *Black's Law Dictionary* defines "expenditure" as a sum paid out (or the act or process of paying out). *Id.* at 617 (8th ed.2004). *Black's* defines "contract" as, among other things, "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law...." *Id.* at 341. "Obligation" means, among other things, "[a] formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons...." *Id.* at 1104. These are broad terms, not limited to transactions involving goods and services.

6. *See* 36 Annals of Cong. 1615–22 (1820); Cong. Globe, 41st Cong., 2d Sess. 349–52 (1870); 39 Cong. Rec. 3687 (1905); 40 Cong. Rec. 1281–88 (1906).

curred, and to which appropriation it is properly charged, the Comptroller General stated that "obligation" "generally has been considered to be a definite commitment which creates a legal liability of the Government for the payment of appropriated funds for goods and services ordered or received." *Id.* at *3. This attempt to provide a working definition is not the same as declaring that the ADA applies *only* to contracts for goods and services. Moreover, as the District points out, in the same opinion the Comptroller General acknowledges "that it is impractical, if at all possible, to phrase into words a clean-cut and all inclusive definition for the term 'obligation' which would serve for all purposes and under all circumstances." *Id.* at *8. *See also In re Corporation for National & Community Service: Amount of Obligations,* B–300480.2, 2003 WL 21361642, at *3 (Comp.Gen. June 6, 2003) (noting that the Comptroller General has "extended the definition [of an obligation] to include a legal duty on the part of the United States which could mature into a legally enforceable claim by virtue of actions on the part of the other party beyond the control of the United States").

Nothing in these opinions purports to exclude open-ended indemnification agreements from the coverage of the ADA. By contrast, when directly confronting the issue, the Comptroller General has concluded that the ADA does forbid such agreements. *See, e.g., In re Assumption by Government of Contractor Liability to Third Persons—Reconsideration,* 62 Comp. Gen. at 364–65. Thus, we are not persuaded that the terms "expenditure," "contract," and "obligation" have the narrow meaning that INA suggests, and we hold that contracts for indemnification like the one at issue here fall within the ambit of the ADA.

## B. The "Sole Control" Argument

█ INA next argues that the agreement was not truly open-ended because the District could have capped its liability at any time by changing its conduct-for example, by abandoning its litigating position and reinstating K & W. We are not persuaded as a factual matter that the District had such complete control over the "costs, fees and expenses" covered by the indemnification provision. More importantly, this argument ignores a principal purpose of the ADA.

█ One goal of the ADA surely is, as INA suggests, to allow the government to maintain control over its liability. However, another fundamental underlying principle is to respect the appropriation powers of the legislature. *See, e.g., Schism v. United States,* 316 F.3d 1259, 1288 (Fed. Cir.2002) ("To say that the Executive Branch could promise future funds for activities that Congress itself had not authorized would also violate both the Anti–Deficiency Act, 31 U.S.C. § 1341(a)(1)(B) ... and the Separation of Powers doctrine, for it would allow the Executive Branch to commandeer the power of the Legislative Branch."); *Public Works–Contracts,* 21 Op. Atty. Gen. 244, 248 (1895) ("The object of these provisions of the statute was ... to prevent executive officers from involving the Government in expenditures or liabilities beyond those contemplated and authorized by the lawmaking power."); *In re Architect of the Capitol–Payment of Fringe Benefits to Temporary Employees,* B–303961, 2004 WL 2793171, *6 (Comp. Gen. Dec.6, 2004) ("The Antideficiency Act is one of the fundamental statutes by which Congress exercises its constitutional control of the public purse.").

We are not surprised, then, that INA has cited only one decision that even arguably supports its assertion that the Repayment Agreement "cannot be said to have

imposed any 'open-ended' obligations ... [b]ecause the District controlled its own exposure...." *See In re Inquiry of Hon. Howard M. Metzenbaum,* 63 Comp. Gen. 145, 150 (1984). That opinion addressed unusual circumstances, and we conclude that it did not announce a generally-applicable exception to the prohibition against open-ended indemnification agreements. The fact that the Comptroller General has cited the opinion only once in the ensuing twenty-four years is evidence of its limited impact.

*Metzenbaum* addressed concerns about a ship chartering program that passed tax benefits ordinarily available to private ship owners on to the Navy in the form of reduced charter rates. *Id.* at 146. The opinion concluded that certain indemnification provisions did "not pose an indefinite or unlimited contingent liability in violation of the Antideficiency Act." *Id.* at 145. Importantly, however, "[t]hese indemnification provisions ... only c[a]me into play if vessels [were] accepted for delivery ...," and the Navy had the right to terminate the agreement before accepting delivery of a vessel. *Id.* at 147–48. The Comptroller General opined that a tax indemnification provision did not violate the ADA because "the contingency is solely in the hands of the Navy." *Id.* at 149. "[T]he Navy may choose to forego or delay ordering vessel improvements or additions until sufficient funding authority is obtained to cover both additional rental and tax reimbursement payments under" the contract. *Id.*

The Navy could also require a ship-owning partner "to contest any disallowance of tax benefit by the Internal Revenue Service, provided the Navy agree[d] to pay the partner's costs and expenses (including attorney's fees) for so doing." *Id.* at 146. This indemnification was permissible because "the Navy itself determines whether the owner will incur any such expenses." *Id.* at 150.

INA argues that the District similarly controlled its liability because "[i]f it had chosen to rescind its decision [to terminate K & W], and to allow K & W to continue as general contractor, INA would have incurred no costs at all." We find this argument strained and unconvincing. The indemnification provisions affecting the Navy were forward-looking. Before taking actions that would trigger indemnification obligations, the Navy could (and the Comptroller General suggested it was obliged to) assess whether it had sufficient funding to cover additional rental and tax reimbursement payments. It knew in advance whether it was exposing itself to liability.

Here, however, the District did not control its own liability—that depended on whether a third-party (the CAB or a court) determined that the termination of K & W "was not justified." Moreover, that termination occurred five months before the District signed the Repayment Agreement. Even if the District subsequently rescinded the termination, INA likely would have already incurred expenses "in connection with the termination of K & W." And those expenses were not limited to the costs of litigation, which admittedly were affected by the District's litigating strategy. It is impossible to know whether a prompt change of heart by the District would have avoided the costs described in note 2, *supra.* In sum, the District's conduct might have affected the *amount* of the costs incurred by INA, but that does not change the fact that this was an open-ended indemnification agreement.

### C. The Judgment and Settlement Fund

INA points out that the District of Columbia has a separate appropriation for

the payment of judgments and settlements. *See* D.C.Code §§ 2–402,–404 (2001). It argues that the existence of this fund "satisfies the requirements of the ADA, thereby permitting District officials and opposing parties to enter settlement agreements without fear that the agreement will later be set aside for non-compliance with the ADA." Finally, it asserts that the Repayment Agreement was a partial settlement chargeable to this fund. We agree with much of what INA says, but not with its conclusion.

▮ Certainly a judgment finding the District liable for breach of contract could be paid out of this fund, and doing so would not violate the ADA. *See Union Pacific,* 52 Fed.Cl. at 733; *see also Bath Iron Works Corp. v. United States,* 20 F.3d 1567, 1583 (Fed.Cir.1994) (federal judgment and settlement fund "was intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy the judg-

ment"). But this portion of INA's argument begs the question of whether the indemnification portion of the Repayment Agreement created an enforceable obligation. No court has ruled that it did, and there certainly is no judgment requiring the District to pay INA's "costs, fees and expenses."

Moreover, we are not convinced that the indemnification portion of the Repayment Agreement was a settlement in the relevant sense.[7] Certainly that agreement resolved the District's claim against the performance bond issued by INA. But the judgment and settlement fund exists to satisfy claims *against* the District. It stretches too far to construe the indemnification agreement as an anticipatory settlement of a claim that INA *might* have acquired against the District in the future. Most importantly, the District's liability remained open-ended.[8] The same policies that undergird the Anti–Deficiency Act counsel against allowing INA to bypass the ADA by collecting its unliquidated "costs, fees and expenses" from the judgment and settlement fund.[9]

7. The District's judgment and settlement fund applies to certain settlements entered into by the Mayor of the District of Columbia. *See* D.C.Code §§ 2–402,–404 (2001). Because we conclude for independent reasons that the indemnification provisions of the Repayment Agreement are not chargeable to this fund, we set aside the question of whether the Mayor had delegated his authority to settle claims and suits to the Deputy Director of the Department of Public Works, the official who signed the Repayment Agreement. *See generally* D.C.Code § 1–204.22(6) (2001) (addressing the Mayor's authority to delegate his functions).

8. *See Availability of Judgment Fund in Cases Not Involving a Money Judgment,* 13 Op. Off. Legal Counsel 98, 101 (1989) (federal judgment fund is available to pay "judgments that, by their terms, require the United States to pay *specified sums of money* to certain parties" (emphasis added)); *id.* at 98 (fund is not

available for suits that "merely would require the government to take actions that result in the expenditure of government funds"); *In re Judgment Fund and Law Enforcement Seizure Claims,* B–259065, 1995 WL 756243, at *2 (Comp.Gen. Dec.21, 1995) ("Congress did not intend the consequential expenses of complying with the injunctive order of a court to be payable from the Judgment Fund."); *In re Availability of Expired Funds for Non-monetary Judicial Awards,* 70 Comp. Gen. 225, 228 (1991) ("[A]s a general rule, unless the government is directly ordered to pay a sum of money, the costs of compliance with the judgment are not considered payable from the Judgment Fund.... Compromise settlements are treated similarly.").

9. It would be a different matter entirely if both parties had assessed the risks involved in litigating INA's claim for $17,372,716.55 and had agreed to compromise and settle that claim for a sum certain.

## D. Contract Reformation

INA asserts that even if the ADA applies, and prohibits enforcement of the Repayment Agreement as written, the contract should be interpreted or reformed to achieve the parties' intentions as far as possible. *See Leiken v. Wilson*, 445 A.2d 993, 998 (D.C.1982) ("[W]hen a contract is fairly open to two constructions, one of which makes it lawful while the other renders it unlawful, the former should be adopted."). Under this proposal, the revised contract would treat the $40 million appropriated by Congress as a "cap" on the District's obligation to indemnify INA. In practical terms, reformation would permit the District to pay INA's "costs, fees and expenses" only to the extent that any of the $40 million appropriation remains unspent.

There is precedent for this approach. In *Union Pacific Railroad Corp.*, a case involving an indemnification agreement, the government's "obligations under [the contract] appear[ed] so open-ended as to contravene the Anti–Deficiency Act." 52 Fed.Cl. at 733–34. Nevertheless, the court granted the plaintiff leave to seek reformation of the contract to specify "(1) that in no event will the government payments under the clause exceed actual appropriations and (2) that nothing in the contract shall be construed as a promise that Congress, at a later date, will appropriate sufficient funds to meet deficiencies." *Id.* at 734–35.[10]

 This court has also recognized that "where an agreement has been reached by the parties but the writing does not accurately express [their] mutual agreement ... reformation is appropriate." *Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 423–24 (D.C.2006) (quotation marks and citation omitted).

The law permits reformation of written contracts where one party proves a mutual mistake in the terms of the agreement. If the language of a written instrument does not reflect the true intent of both parties, then their mutual mistake is reformable. This reformation is driven by a respect for the parties' intent and gives effect to the terms mutually agreed upon by the parties.

27 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 70:2 (4th ed.2003); *see also* 17A Am.Jur.2d Contracts § 340 (2005) ("Courts are obligated to construe contracts that are potentially in conflict with a statute, and thus void as against public policy, where reasonably possible, to harmonize them with the statute."). However, "[s]ince the remedy of reformation is equitable in nature, a court has the discretion to withhold it, even if it would otherwise be appropriate, on grounds that have traditionally justified courts of equity in withholding relief." Restatement (Second) of Contracts § 155, cmt. d (1981).

At one time the Comptroller General seemed to allow indemnification agreements that would otherwise be open-ended if there was "an explicit contractual limitation of liability to funds available at the time of the occurrence of the contingency, coupled with the assurance that nothing in the agreement will be viewed as binding

---

10. The latter provision would be added to avoid creating a "coercive deficiency." That term describes a situation where an agency has spent or obligated its entire appropriation but has incurred other moral and legal obligations to persons who have fulfilled their part of a bargain with the government. In such circumstances, Congress might feel that it had no choice but to appropriate money to fulfill these commitments. In other words, it would feel coerced into making up the deficiency. *See PCL Construction Services, Inc. v. United States*, 41 Fed.Cl. 242, 251 (1998).

Congress to approve additional funds to cover a possible deficiency." *Metzenbaum*, 63 Comp. Gen. at 147 (describing opinion in *In re Reimbursement of State of New York Under Olympic Support Contract*, B–202518, 1982 WL 28395 (Comp.Gen. Jan.8, 1982)). Later, however, the Comptroller General recognized that, although such a solution "prevents an overt violation of the Antideficiency Act [it] has potentially disastrous fiscal consequences for the Federal agency involved...." [11] *In re Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp. Gen. at 367. The Comptroller General's "current view is that open-ended indemnification agreements should not be entered into *regardless of the existence of language of limitation* except with express congressional acquiescence." *In re U.S. Park Police Indemnification Agreement*, B–242146, 1991 WL 200162, at *2 (Comp. Gen.1991) (emphasis added); *accord*, 63 Comp. Gen. at 147; 62 Comp. Gen. at 368.

 It thus appears that, if we allowed reformation in the manner suggested, the resulting contract would violate the current guidance of the Comptroller General. We obviously are reluctant to authorize such an outcome. In these circumstances, moreover, reforming the contract would amount to a salvage operation, not an effort to accurately express the mutual agreement of the parties. The stark reality is that the parties intended what they wrote, but ignored the restrictions imposed by the Anti–Deficiency Act. It would be entirely fictitious to say that they intended for any indemnification obligation to be capped by whatever portion of the $40 million appropriation happened to remain unspent at the time the liability arose. *Cf. California–Pacific Utilities Co.*, 194 Ct.Cl. 703, 718 (reformation not appropriate because plaintiff failed to prove "a mutual mistake by the parties in the expression of their true intent").

The District of Columbia's representative departed from longstanding governmental policy when he expressly represented that he was "fully authorized and empowered to enter into" the Repayment Agreement. However, we have seen no proof that the District signed the indemnification agreement in bad faith. And there are serious roadblocks deterring the District from now resolving to honor the spirit of its previous agreement. *See, e.g.*, 31 U.S.C. § 1350 (criminal penalties for violating the ADA); 31 U.S.C. § 1349(a) (authorizing administrative discipline for violating the ADA).

Moreover, we cannot treat INA as an unsuspecting dupe. "In accordance with Supreme Court case law, this court has repeatedly held that one who contracts with a government agent is constructively notified of the limits of that agent's authority, and any reliance on contrary representations cannot be reasonable." *Williams*, 902 A.2d at 96. INA's claims fail as a matter of law.

---

11. "Payment of an especially large indemnity obligation could wipe out the entire unobligated balance of the agency's appropriation...." *In re U.S. Park Police Indemnification Agreement*, B–242146, 1991 WL 200162, at *2 (Comp.Gen.1991). In this case, for example, an early requirement that the District pay $17 million for indemnity obligations (close to half of the $40 million appropriation) might have prevented completion of the Union Station project. In other circumstances, the promise may prove illusory. "[I]f a liability arises toward the end of the fiscal year it is quite possible that no unobligated balance would be available for an indemnity payment." *Id.; see also In re Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp. Gen. at 367.

For the reasons discussed, the judgment of the Superior Court is hereby

*Affirmed.*