# Online Terms of Service Agreements with Open-Ended Indemnification Clauses Under the Anti-Deficiency Act

Traditional principles of contract law govern the standard for consent to an online terms of service agreement, and, as a result, consent to such an agreement turns on whether the web user had reasonable notice of and manifested assent to the online agreement.

A government employee with actual authority to contract on behalf of the United States violates the Anti-Deficiency Act by entering into an unrestricted, open-ended indemnification agreement on behalf of the government.

A government employee who lacks authority to contract on behalf of the United States does not violate the Anti-Deficiency Act by consenting to an agreement, including an agreement containing an unrestricted, open-ended indemnification clause, because no binding obligation on the government was incurred.

March 27, 2012

MEMORANDUM OPINION FOR THE
ASSISTANT GENERAL COUNSEL FOR ADMINISTRATION
DEPARTMENT OF COMMERCE

You have asked whether a Department of Commerce ("Department") employee violates the Anti-Deficiency Act ("ADA") when he consents on behalf of the government to terms of service ("TOS") that include an unrestricted, open-ended indemnification clause in the course of registering for an account with a social media application on the Internet.[1]

We first address the preliminary question whether the standard for consent to an online TOS agreement is different from the standard for consent in traditional contract law. We conclude that traditional principles of contract law govern this question and that, as a result, consent to an online TOS agreement turns on whether the web user had reasonable notice of and manifested assent to the online agreement.

---

[1] *See* Letter for Caroline D. Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Barbara S. Fredericks, Assistant General Counsel for Administration, Department of Commerce (June 2, 2011) ("Commerce Letter"). We also received the views of the General Services Administration ("GSA"). *See* Letter for Caroline D. Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Kris E. Durmer, General Counsel, General Services Administration (July 8, 2011) ("GSA Letter").

We next consider whether entry into an unrestricted, open-ended indemnification agreement violates the ADA. We conclude that the answer to this question is different for employees with actual authority to contract on behalf of the United States and those without such authority. Although an unrestricted, open-ended indemnification clause is not enforceable against the United States in either circumstance, *see, e.g.*, *Hercules, Inc. v. United States*, 516 U.S. 417, 427 & n.10 (1996), an employee with actual authority to contract on behalf of the government violates the ADA by entering into such an obligation. In contrast, a government employee who lacks authority to contract on behalf of the United States cannot enter into an agreement that creates binding obligations for the United States. Thus, we conclude that an employee without any contracting authority does not violate the ADA by consenting to an agreement, including an agreement containing an unrestricted, open-ended indemnification clause, because no obligation was ever incurred.

## I.

You have described to us two situations in which Department employees have consented to social media TOS agreements that include indemnification clauses. In the first situation, an agency within the Department sought to establish a database of images available to employees to use in their print and online materials. In setting up the database, an employee downloaded images for free from at least three websites: MorgueFile.com, Dreamstime.com, and Stock.xchng. To download images from these websites, a user must first register for an account by agreeing to the website's TOS, which is done by checking a box that reads: "I have read and agree to the Terms of Use." The TOS agreement for each of these websites incorporates an indemnification clause. Commerce Letter at 1–2.[2] Thus, by registering for accounts with

---

[2] The indemnification clause for MorgueFile.com, for example, provides:

> You agree to indemnify and hold harmless morguefile.com, its contractors, and its licensors, and their respective directors, officers, employees and agents from and against any and all losses, damages, claims and expenses, including attorneys' fees, arising out of your use of the Website, including but not limited to any such losses, damages, claims and expenses arising out of your violation of the Agreement.

Commerce Letter at 2 n.4.

these three websites, the employee consented to TOS agreements that contained indemnification clauses. *Id.* at 2. According to the Department, the employee is not a contracting officer, does not maintain a purchase card, and has not been delegated proper authority to register to use social media applications. *Id.* at 3.

In the second situation, an employee with a different agency within the Department registered for an account with watershed.ustream.tv, a self-serve platform for live, interactive video. Watershed does not offer a free account; the user must pay for a subscription or select a pay-as-you-go option. Watershed also requires that the user consent to a TOS agreement that includes an indemnification clause. The Department discovered that the agency had established an account with watershed.ustream.tv and that one of its offices had been subscribing to that account for the past two years and was billed quarterly through its purchase card. In this case, the employee consenting to the TOS agreement was a purchase card holder and thus, by regulation, was a contracting officer or other authorized individual designated by the agency to contract on its behalf. *Id.* at 2, 4.[3]

You have asked whether the ADA is violated whenever a government employee, in establishing a social media account, consents to a TOS agreement containing an indemnification clause and what practical consequences flow from such unauthorized agreements. You also have asked whether a passive TOS agreement—one in which (unlike the situations described above) a user agrees to the TOS of an online application simply by using the application—can bind the government. While we decline to address whether particular past actions violated the ADA, we will use the basic features of these scenarios to provide general guidance in response to your questions.

## II.

The Anti-Deficiency Act provides in relevant part:

> (a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—

---

[3] We assume, for purposes of discussion, that all of the indemnification clauses at issue are similar to that quoted above for MorgueFile.com.

> (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]
>
> (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law[.]

31 U.S.C. § 1341(a)(1) (2006).[4] Violations of section 1341(a) must be reported immediately to the President and Congress, with a copy of each report going to the Comptroller General. *Id.* § 1351. Officers or employees violating this section are subject to administrative discipline, and knowing and willful violators may face criminal penalties. *Id.* §§ 1349, 1350.

As recognized by the courts and this Office, the Comptroller General has long taken the position that the ADA is violated by any indemnification agreement that, without statutory authorization, imposes on the United States an open-ended, potentially unrestricted liability. In such circumstances, there can never be certainty that sufficient funds have been appropriated to cover the liability. For example, in *Hercules*, 516 U.S. 417, the Supreme Court refused to find an implied-in-fact indemnity agreement. It explained that "the Comptroller General has repeatedly ruled that Government procurement agencies may not enter into . . . open-ended indemnity for third-party liability" because such agreements are barred by the ADA. *Id.* at 427; *see also Cal.-Pac. Utils. Co. v. United States*, 194 Ct. Cl. 703, 715 (1971) ("The United States Supreme Court, the Court of Claims, and the Comptroller General have consistently held that absent an express provision in an appropriation for reimbursement adequate to make such payment, [the ADA] proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated."); *Indemnification Agreements and the Anti-Deficiency Act*, 8 Op. O.L.C. 94, 96 (1984) ("*Indemnification Agreements*") (recognizing the Comptroller General's long series of opinions holding that "the Anti-Deficiency Act is transgressed by any indemnity provision that subjects

---

[4] In addition, the Adequacy of Appropriations Act, 41 U.S.C. § 11 (2006), prohibits any contractual arrangement of the government "unless the same is authorized by law or is under an appropriation adequate to its fulfillment." We refer to both statutes collectively as the Anti-Deficiency Act or ADA.

the United States to an indefinite, indeterminate, or potentially unlimited liability"); *e.g.*, *Federal Aviation Administration Negotiations with Pacific Gas and Electric Company*, B-260063, 1995 WL 390069, at *5 (Comp. Gen. June 30, 1995); *Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp. Gen. 361, 363–66 (1983); *To the Administrator, General Services Administration*, 35 Comp. Gen. 85, 87 (1955); *To the Secretary of the Interior*, 16 Comp. Gen. 803, 804 (1937); *To the Secretary of War*, 7 Comp. Gen. 507, 507–08 (1928).[5]

Not every indemnification agreement violates the ADA,[6] but the kind of open-ended, uncapped indemnification clause at issue in many social media TOS agreements would run afoul of the statute. Although the online context does not alter the invalidity of such an indemnification clause, TOS agreements in this relatively new and growing area present some distinct legal issues, both because of the absence of traditional paper contracts and because of the ease with which government employees who are not authorized contracting officers can enter into agreements that purport to bind the United States.

---

[5] *See also* 2 Gov't Accountability Office, *Principles of Federal Appropriations Law* 6-59 to 6-60 (3d ed. 2006) ("*Federal Appropriations Law*") ("[A]bsent express statutory authority, the government may not enter into an agreement to indemnify where the amount of the government's liability is indefinite, indeterminate, or potentially unlimited. Such an agreement would violate both the Antideficiency Act . . . and the Adequacy of Appropriations Act . . . , since it can never be said that sufficient funds have been appropriated to cover the government's indemnification exposure."); Office of Management and Budget, Circular No. A-11, § 145, at 3 (2010) ("If you . . . [s]ign a contract that obligates the Government to indemnify parties against losses ('open-ended indemnification' clause) . . . , [t]hen, you must report a violation of . . . 31 U.S.C. 1341(a).").

[6] As we have recognized, the Comptroller General has upheld indemnification clauses when the potential liability of the United States is limited to an amount that is *both* known at the time of the agreement and within the amount of available appropriations. The Comptroller General has also created a narrow exception permitting indemnification of a public utility service, in limited circumstances, for injury or damage not caused by the utility company; and, of course, exceptions to the ADA have been created by statute. *Indemnification Agreements*, 8 Op. O.L.C. at 97–99 (citing Comptroller General decisions and statutes recognizing or creating exceptions to the ADA). Without an applicable exception, however, an indemnification agreement must include a limitation on the amount of liability and must state both that the liability is limited to the amount of appropriated funds available at the time of payment and that the contracting agency implies no promise that Congress will appropriate additional funds to meet any deficiency in the event of loss. *Id.* at 98.

## A.

Online TOS agreements often present basic questions regarding whether the consent necessary to form a contract is present. *See Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997) (among the requirements for a valid contract with the United States is "a mutual intent to contract including offer, acceptance, and considera-tion"). In this emerging area, courts have applied traditional principles of contract law and focused on whether the web user had reasonable notice of, and manifested assent to, the online agreement. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 28–30 (2d Cir. 2002).

As both you and GSA recognize, the two scenarios you describe in which Department employees "actively consented to the terms" raise no substantial legal questions regarding whether adequate consent to contract was present. *See* Commerce Letter at 3, 4; GSA Letter at 2. The type of TOS agreement you have described is commonly called a "clickwrap" agreement, in which a user must manifest assent to the website's terms of service by affirmatively taking an action, such as checking a box or click-ing an "I accept" or "I agree" button. Because clickwrap agreements require affirmative consent on the part of the user, courts generally have upheld their enforceability as contracts. *See, e.g.*, *Segal v. Amazon.com, Inc.*, 763 F. Supp. 2d 1367, 1369 (S.D. Fla. 2011), *mandamus denied*, No. 11-10998-D, 2011 WL 1582517 (11th Cir. Apr. 21, 2011); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 235–39 (E.D. Pa. 2007); *Burcham v. Expedia, Inc.*, No. 4:07CV1963 CDP, 2009 WL 586513, at *2–4 (E.D. Mo. Mar. 6, 2009); *Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91, 92 (N.Y. App. Div. 2002). Whether the web user actually reads the website's TOS is immaterial. "Absent a showing of fraud, failure to read an enforceable clickwrap agreement, as with any binding contract, will not excuse com-pliance with its terms." *Feldman*, 513 F. Supp. 2d at 236.

You have also asked about the legal ramifications of a government em-ployee's *passive* agreement to a website's TOS—often called a "browse-wrap" agreement—simply by using the online application. Commerce Letter at 4. Browsewrap agreements, unlike clickwrap agreements, do not require the user to give express assent to the website's terms, such as by checking a box or clicking a button. Instead, browsewrap agreements typically "involve a situation where notice on a website conditions use of

the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink. . . . Thus, a party gives his or her assent simply by using the website." *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (quoting *Sw. Airlines v. Boardfirst, L.L.C.*, No. 06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007)).

Both you and GSA suggest that such an agreement could not constitute a binding contract because the web user has taken no affirmative action to agree to its terms. Commerce Letter at 4; GSA Letter at 2. Current case law, however, suggests that there is no categorical rule that browsewrap agreements are unenforceable. Instead, their validity is assessed on a case-by-case basis. Specifically, for a browsewrap agreement to be enforceable, "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential." *Specht*, 306 F.3d at 35. As other courts have put it: "[A]bsent a showing of actual knowledge of the terms by the webpage user, the validity of a browsewrap contract hinges on whether the website provided reasonable notice of the terms of the contract." *Van Tassell*, 795 F. Supp. 2d at 790–91; *see also Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) ("In ruling on the validity of a browsewrap agreement, courts consider primarily 'whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site.'"), *aff'd*, 380 F. App'x 22 (2d Cir. 2010).

Different facts have produced different conclusions about the enforceability of browsewrap agreements. In *Specht*, the Second Circuit held that a reasonably prudent Internet user would not have known or learned of the existence of the license terms before responding to a particular website's invitation to download free software and, accordingly, that the website did not provide reasonable notice of the license terms. 306 F.3d at 20, 28–30. As a result, "plaintiffs' bare act of downloading the software did not unambiguously manifest assent to the arbitration provision contained in the license terms." *Id.* at 20. Similarly, in *Hines*, the court found no contract because the user was never advised of the terms and conditions and could not see the link to them without scrolling down to the bottom of the screen, which she was not required to do to make her purchase. 668 F. Supp. 2d at 367. By contrast, an Illinois appellate court found that an online contract provided reasonable notice where a blue hyperlink entitled

"Terms and Conditions of Sale" appeared on numerous web pages the plaintiffs completed in the ordering process, and where the plaintiffs were advised on three separate web pages that "[a]ll sales are subject to Dell's Term[s] and Conditions of Sale." *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121–22 (Ill. App. 2005); *see also PDC Labs., Inc. v. Hach Co.*, No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) (finding online terms sufficiently conspicuous where the terms were "hyperlinked on three separate pages of the online Plate order process in underlined, blue, contrasting text" and were brought to the user's attention by specific reference in the final order step, which directed the user to "[r]eview terms," followed by a hyperlink to the terms).

As this case law reflects, browsewrap agreements often present more difficult questions about user consent than clickwrap agreements, but there is no per se rule against their enforceability. Government employees registering for Internet social media accounts will need to ensure that they do not inadvertently consent to TOS agreements that violate the ADA (or other provisions of law), whether or not the online application requires the user to give express consent to the website's terms of service.

## B.

You first ask whether a government employee without authority to bind the government who signs up for a social media account, and thereby assents to the terms of an agreement containing an open-ended, unrestricted indemnification clause, has violated the ADA. In your view, while the employee may have made an unauthorized commitment, there would be no valid agreement because the employee has no authority to bind the government. Accordingly, the employee would not have violated the ADA. Commerce Letter at 3; *see also* GSA Letter at 3 (same). Although the question is a difficult one on which little authority exists, we agree that government employees who lack authority to contract on behalf of the United States have made unauthorized commitments, but have not violated the ADA, even if they purport to consent to contract terms, such as an open-ended, unrestricted indemnification clause, that would impose an obligation on the United States exceeding or preceding available funds in an appropriation.

An open-ended, unrestricted indemnification clause potentially violates the ADA because it represents an "obligation exceeding an amount available in an appropriation or fund." 31 U.S.C. § 1341(a)(1)(A). It may also "involve" the government in an "obligation" for "payment of money before an appropriation is made." *Id.* § 1341(a)(1)(B). To violate the statute, therefore, the government officer or employee entering into the contract must have authorized or involved the government in an "obligation" in excess or in advance of funds available in an appropriation. Only a government officer or employee with actual authority to bind the government in contract, however, can authorize or involve the government in such an obligation.

The term "obligation" has a well-understood meaning in fiscal law, as is illustrated in the usage of the term by the Comptroller General and the U.S. Government Accountability Office ("GAO"). They have defined "obligation" as "[a] definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States." Gov't Accountability Office, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 70 (2005); *To the Administrator, Agency for International Development*, 42 Comp. Gen. 733, 734 (1963) (an "obligation of funds" exists if there is "a legal duty on the part of the United States which constitutes a legal liability or which could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States"); *accord Contract for Legal Services*, B-322147, 2011 WL 2644733, at *2 (Comp. Gen. July 6, 2011); *Obligational Practices of the Corporation for National and Community Service*, B-300480, 2003 WL 1857402, at *3 (Comp. Gen. Apr. 9, 2003); *see also McDonnell Douglas Corp. v. United States*, 39 Fed. Cl. 665, 671 (1997). Thus, "[w]hen an agency takes some action that creates a legal liability, the agency 'obligates' the United States government to make a payment. . . . A legal liability is a claim that may be legally enforced against the government." *National Mediation Board—Compensating Neutral Arbitrators Appointed to Grievance Adjustment Boards Under the Railway Labor Act*, B-305484, 2006 WL 1669294, at *4 (Comp. Gen. June 2, 2006).

For example, in discussing the Anti-Deficiency Act implications of National Mediation Board ("NMB") appointments of arbitrators to grievance adjustment boards, the Comptroller General explained that "only an authorized officer of the United States government can enter into a contract or other binding commitment on behalf of the government." *Id.* at *11. "Consequently, if someone other than an authorized officer attempts to sign a contract or other agreement committing the government to some action, *the commitment is not binding on the government*." *Id.* (emphasis added). Thus, the Comptroller General concluded that the NMB incurs an "obligation" for ADA purposes "when an authorized NMB official appoints an arbitrator to a specific case or a specified group of related cases," *id.*, and it is the appointment "by an authorized NMB official . . . that is the obligating event for NMB." *Id.* at *12.

Determining whether a government officer or employee has authorized or involved the government in an "obligation" for ADA purposes, then, requires an assessment whether the officer or employee has entered into a contract that binds the United States. A binding contract is formed only if an authorized employee has entered into (or ratified) the agreement. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (in addition to the usual contract-formation elements, "[a] contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States"); *accord Total Med. Mgmt.*, 104 F.3d at 1319. It is settled law that the United States is not bound by a contract entered into by a government employee acting outside his authority.[7] Anyone entering into an arrangement with the government "takes the risk of having accurately ascertained

---

[7] A government employee purporting to bind the United States in contract acts outside his authority when he has no authority to contract for the United States *or* when he exceeds whatever contract authority he possesses. As GSA observes, under the Federal Acquisition Regulations System ("FAR"), "[c]ontracting officers may bind the Government only to the extent of the authority delegated to them," GSA Letter at 4 (citing 48 C.F.R. § 1.602-1(a) (2010)), and that authority may be limited to a specific dollar amount in the contracting officer's warrant, *id.*; *see also* 48 C.F.R. § 1.603-3(a) (2010) (certificate of appointment of contracting officer shall state any limitations on the scope of authority to be exercised). Thus, a contracting officer whose warrant, for example, authorizes him to bind the United States only up to $10,000 would have no authority, in consenting to an open-ended indemnification agreement, to obligate the United States to pay more than that limit.

that he who purports to act for the Government stays within the bounds of his authority." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *see, e.g.*, *City of El Centro v. United States*, 922 F.2d 816, 820–21 (Fed. Cir. 1990) (rejecting hospital's claim for costs in treating injured illegal aliens at the request of a Border Patrol agent where the agent had no authority to bind the government in contract); *Stout Rd. Assocs. v. United States*, 80 Fed. Cl. 754, 757–58 (2008) (rejecting claim by hotel based on canceled hotel reservation where the agreement was entered into by an intern with no contracting authority and her supervisors lacked authority to delegate such authority to her or to ratify the agreement themselves); *cf. Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 415–16, 424–25, 434 (1990) (erroneous advice given by a government employee to a benefits claimant does not give rise to estoppel against the Government and thereby entitle the claimant to a monetary payment not permitted by law).[8]

For these reasons, a government employee without contracting authority cannot bind the United States to an online TOS agreement. Accordingly, that unauthorized employee has neither "authorize[d]" nor "involve[d]" the government in an "obligation" to indemnify the social

---

[8] *See also, e.g.*, *To Clyde Esnard Malle*, 18 Comp. Gen. 568, 571–73 (1938) (rejecting claim for compensation where the government employees involved had no authority to contract on behalf of the United States for the claimant's services); *Architect of the Capitol—Contract Ratification*, B-306353, 2005 WL 2810714, at *2 (Comp. Gen. Oct. 26, 2005) (Architect of Capitol not obligated to pay contractor for construction performed pursuant to directives by employee who lacked authority); *Instructions for Settling Claim of Anthony R. Grijalva*, B-204002.OM, 1982 WL 27962, at *1 (Comp. Gen. Mar. 31, 1982) (agreement for rental of horse void because district ranger lacked contracting authority); *Claim of Hertz Corporation for Payment of Car Rental Charges*, B-199804.OM, 1981 WL 24420, at *1–3 (Comp. Gen. Feb. 24, 1981) (no liability to Hertz Corporation for credit card where supply officer had no authority to bind the government to a contract for open-ended use of credit cards).

Many social media services are provided at no immediate cost to the government, raising the question whether a government employee is required to have contracting authority to bind the agency in such an arrangement. GSA Letter at 2–3. We see nothing in the FAR or case law that would permit an unauthorized government employee to bind the government in contract even if the contract imposes no upfront costs on the government. Furthermore, social media agreements containing indemnification clauses could impose costs, because such clauses, if enforceable, could impose monetary liability on the United States.

media company and therefore has not violated the Anti-Deficiency Act. 31 U.S.C. § 1341(a)(1)(A)–(B). By the same token, the employee cannot be said to have "involve[d]" the government in a "contract" for the payment of money in advance of an appropriation. *Id.* § 1341(a)(1)(B).[9] As one pair of commentators put it, "an obligation cannot arise against the United States merely because an unauthorized official has procured goods or services. Much more is necessary, and it does not follow that an Anti-Deficiency Act violation occurs, *eo instanti*, with every irregular procurement." Gary L. Hopkins & Robert M. Nutt, *The Anti-Deficiency Act (Revised Statutes 3679): And Funding Federal Contracts: An Analysis*, 80 Mil. L. Rev. 51, 89 (1978).[10]

Furthermore, it would be inappropriate and, indeed, would likely violate the ADA if an authorized official were to ratify a TOS agreement containing an unenforceable indemnification clause executed by an employee without contract authority or with insufficient contract authority. *See* Commerce Letter at 3. Under the FAR, the head of a contracting activity or higher-level official, if designated, may ratify an unauthorized commitment but only if "[t]he resulting contract would otherwise have been proper if made by an appropriate contract-

---

[9] Although, as GSA points out, a contracting officer with restricted contracting authority cannot bind the United States to an open-ended online indemnification agreement in an amount that exceeds his contracting authority, GSA Letter at 4, such a contracting officer may nonetheless violate the ADA by entering into such an indemnification agreement— effectively capped at the limit of the officer's contracting authority—because the loss subject to the indemnification agreement may arise in a future year in which the availability of an appropriation to pay that potential liability is unknown. For that reason, as we have previously recognized, the Comptroller General has insisted that even an indemnification agreement "limited to a definite maximum" must provide "(1) that only the amount of appropriated funds actually available at the time of loss will be paid, and (2) that it creates no obligation to appropriate additional funds." *Management of Aircraft Hijacking*, 2 Op. O.L.C. 219, 224 (1978); *see also Indemnification Agreements*, 8 Op. O.L.C. at 96 (same); 2 *Federal Appropriations Law* at 6-73 (to ensure that agency will have sufficient funds available should contingent liability under an indemnification agreement ripen into an obligation, the agency must either "obligate or . . . reserve administratively sufficient funds to cover the potential liability," or the agreement must "expressly limit the government's liability to appropriations available at the time of the loss with no implication that Congress will appropriate funds to make up any deficiency").

[10] We do not address here whether a government employee without contracting authority may violate the ADA by "mak[ing] . . . an expenditure . . . exceeding an amount available in an appropriation or fund." 31 U.S.C. § 1341(a)(1)(A).

ing officer." 48 C.F.R. § 1.602-3(b)(2), (c)(3) (2010); Dep't of Commerce, Commerce Acquisition Manual 1301.602, Ratification of Unauthorized Commitments § 3.2.1(b)(iii), at 5 (2009), http://www.osec.doc.gov/oam/acquistion_management/policy/commerce_acquisition_manual_cam/default.htm. Entering into a TOS agreement containing an indemnification clause that violates the ADA would not otherwise have been proper, even if approved by an authorized official.

## C.

We turn now to whether a government officer or employee *with contracting authority* violates the ADA by entering into a TOS agreement that includes an unrestricted, open-ended indemnification clause.[11] Such agreements violate the ADA and, as a consequence, are unenforceable. As noted, open-ended, unrestricted indemnification clauses are unenforceable against the government because they violate the ADA—whether or not the official involved otherwise has contracting authority. GSA Letter at 3. On several occasions, the Supreme Court held under earlier versions of the ADA or related statutes that the government was legally incapable of incurring a contractual obligation to pay more money than Congress had appropriated or to pay money over a longer period than covered by an appropriation. *See, e.g.*, *Leiter v. United States*, 271 U.S. 204, 206–07 (1926); *Sutton v. United States*, 256 U.S. 575, 580–81 (1921); *Hooe v. United States*, 218 U.S. 322, 332–34 (1910); *Bradley v. United States*, 98 U.S. 104, 116–17 (1878); *see generally* Memorandum for Stephen R. Colgate, Assistant Attorney General for Administration, from Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of the Antideficiency Act to a Violation of a Condition or*

---

[11] We recognize that some indemnification agreements, although appearing to be open-ended and unrestricted, are in fact limited, such as when the government's potential liability is determinable (for example, when that potential liability is capped at the value of a commodity, *see, e.g.*, *To the Administrator, Federal Aviation Agency*, 42 Comp. Gen. 708, 710 (1963)), or when its liability or commitment to indemnify can be avoided by actions under the government's control, s*ee, e.g.*, *To the Honorable Howard M. Metzenbaum, U.S. Senate*, 63 Comp. Gen. 145, 148 (1984); *see also* 2 *Federal Appropriations Law* at 6-72 to 6-74. This opinion does not address these or any similar circumstances in which there would be no violation of the ADA despite the government's having entered into an apparently open-ended, unrestricted indemnification agreement.

*Internal Cap Within an Appropriation* at 16–17 (Jan. 19, 2001) (discussing Supreme Court decisions). Similarly, with respect to open-ended indemnification clauses, courts have relied on the ADA in refusing to find implied indemnification agreements and in rejecting express indemnification agreements. *See, e.g.*, *Hercules*, 516 U.S. at 427; *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed. Cir. 2008); *In re All Asbestos Cases*, 603 F. Supp. 599, 611–12 (D. Haw. 1984); *Union Pac. R.R. Corp. v. United States*, 52 Fed. Cl. 730, 732–34 (2002); *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1, 22–25 (1987); *Cal.-Pac. Utils. Co.*, 194 Ct. Cl. at 715; *Ins. Co. of N. Am. v. Dist. of Columbia*, 948 A.2d 1181, 1186–88 (D.C. 2008). Thus, the courts have held that, by operation of the ADA itself, a government officer or employee who purports to agree to an indemnification clause has not actually committed the United States to a binding obligation. In *Leiter*, for example, the trustees of a landlord sued for the rent under leases to the Treasury Department, but because the leases were contrary to the Anti-Deficiency Act, the Court held that the trustees could not recover. 271 U.S. at 205, 207–08.

This situation, then, gives rise to the peculiar question whether a government employee with contracting authority violates the ADA when, *because of the ADA*, the employee has failed to authorize an enforceable "obligation" that otherwise would exceed funds available in an appropriation. We conclude that the ADA has been violated in these circumstances. The mere fact that commitments made in violation of the ADA are not legally enforceable does not somehow erase the ADA violation; otherwise, the ADA could not be violated. The ADA mandates that, for violations of section 1341(a), the head of the agency "shall report immediately to the President and Congress all relevant facts and a statement of actions taken," with a copy of each report to be transmitted simultaneously to the Comptroller General. 31 U.S.C. § 1351. A government officer or employee who violates section 1341(a) can be subject to administrative discipline and penal sanctions. *Id.* §§ 1349, 1350. These provisions would have no effect, and would make no sense, if an ADA violation does not occur because the violation itself makes the obligation invalid. Moreover, an otherwise binding contract that contains a clause violating the ADA may create precisely the sort of moral obligation for Congress to appropriate money for payments under the contract—a so-called "coercive deficien-

cy"—that Congress enacted the ADA to counteract. *See* 2 *Federal Appropriations Law* at 6-34 to 6-35; *Project Stormfury—Australia—Indemnification for Damages*, 59 Comp. Gen. 369, 372 (1980) ("coercive deficiencies" involve situations where an agency has legally or morally committed the United States to make good on a promise). Finally, we note, based on seven years of reports by the GAO compiling ADA violations,[12] that at least some agencies appear to have treated open-ended indemnification clauses subjecting the government to indefinite liability as violating the ADA and have reported such violations. *See* GAO, Antideficiency Act Reports—Fiscal Year 2011, at 1 (Feb. 9, 2012), https://www.gao.gov/legal/appropriations-law-decisions/resources; GAO, Antideficiency Act Reports—Fiscal Year 2010, at 7 (Jan. 9, 2011) (same); GAO, Antideficiency Act Reports—Fiscal Year 2008, at 12, 13 (Mar. 3, 2009) (same); GAO, Antideficiency Act Reports—Fiscal Year 2006, at 4, 5, 11 (Mar. 9, 2007) (same); GAO, Antideficiency Act Reports—Fiscal Year 2005, at 6 (Aug. 11, 2006) (same).

For these reasons, we conclude that the Anti-Deficiency Act is violated when a government officer or employee with authority to bind the government agrees, without statutory authorization or some other exception, to an open-ended, unrestricted indemnification clause.

## III.

You have asked about the practical consequences for the government (rather than for the employee) that flow from an authorized government employee's consent to an online TOS agreement that contains an unenforceable indemnification clause. We make two observations in this regard.

First, the Department has a duty to mitigate an ADA violation—particularly when an agreement is in effect—as soon as possible. *See To the Chairman, Committee on Appropriations, House of Representatives*, 55 Comp. Gen. 768, 772 (1976) ("*Committee on Appropriations*") ("We believe it is obvious that, once an Antideficiency Act violation has been discovered, the agency concerned must take all reasonable steps to miti-

---

[12] Congress amended 31 U.S.C. § 1351 in 2004 to require that a copy of each report of an ADA violation be transmitted to the Comptroller General. *See* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, § 1401(a), 118 Stat. 2809, 3192 (2004).

gate the effects of the violation insofar as it remains executory."); *The Honorable Glenn English*, B-223857, 1987 WL 101593, at *6 (Comp. Gen. Feb. 27, 1987) ("Once CCC [Commodity Credit Corporation] determined that sufficient funds were not available to pay for the meat it had ordered because its borrowing authority had been depleted . . . , the Antideficiency Act required CCC to do what it could to mitigate or minimize the magnitude of a possible Antideficiency Act violation."). Often, mitigation requires terminating the contract. *See Committee on Appropriations*, 55 Comp. Gen. at 772. Accordingly, for those online social media TOS agreements that have already been executed and that contain an indemnification provision that violates the ADA, the Department should renegotiate the terms of service to revise or eliminate the indemnification clause[13] or cancel the Department's enrollments in social media applications when their operators insist on such a clause.

Second, you ask whether, if agency employees without authority to bind the agency do not violate the ADA when, in the course of signing up for social media applications, they agree to TOS agreements with indemnification clauses, the government is "subject to no legal ramifications despite the apparent benefits to the government." Commerce Letter at 5. Although such indemnification clauses would not be enforceable, in some circumstances the government arguably may pay, or be ordered to pay, for the reasonable value of benefits received from a contractor (e.g., the reasonable value of downloaded photos) under the equitable principle of quantum meruit. "Under the doctrine of quantum meruit, the government pays the reasonable value of services it actually received on an implied, quasi-contractual basis." *Maintenance Service & Sales Corporation*, 70 Comp. Gen. 664, 666 (1991) (concluding that requirements for quantum meruit payment for repair services for government-owned vehicles were satisfied). "Payment under this authority is appropriate where there is no enforceable contractual obligation on the part of the government but where the government has received a benefit not prohibited by law conferred in good faith." *Unauthorized Legal Services Contracts Improperly Charged to Resource Management Appropriation*, B-290005, 2002 WL

---

[13] GSA has provided examples of TOS agreements that correct or eliminate problematic provisions such as indemnification clauses. *See* GSA Letter at 3 n.3 (citing agreements posted on GSA's website apps.gov).

1611488, at *3 n.9 (Comp. Gen. July 1, 2002). Thus, for example, the Comptroller General opined that, even though the Fish and Wildlife Service had entered into a contract for legal services without authority and in violation of the ADA, the Solicitor of the Department of the Interior could choose to pay the contractors on a quantum meruit basis, so long as sufficient unobligated funds were available in the applicable appropriation. *Id.* at *3, *4 n.9; *see also Perri v. United States*, 340 F.3d 1337, 1344 (Fed. Cir. 2003) (quantum meruit recovery may be available in the Court of Federal Claims to a plaintiff who provides goods or services to the government pursuant to an express contract that contains defects rendering it invalid or unenforceable); *e.g.*, *Prestex, Inc. v. United States*, 320 F.2d 367, 373 (Ct. Cl. 1963). In some circumstances, it may be that no quantum meruit payment could be made or ordered, particularly if the website provided free access (apart from the value of the unenforceable indemnification agreement) or if the government already has paid for access. Nevertheless, in other situations, the government arguably could be required to make a quantum meruit payment.

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*
